**McKEOWN DISTRIBUTORS, INC.**

v.

**GYP–CRETE CORPORATION.**

Civ. No. H–82–834(JAC).

United States District Court,
D. Connecticut.

July 25, 1985.

Lester Katz, Steven L. Seligman (Katz & Seligman), and James C. Mulholland, Michael A. Georgetti (Mulholland & Georgetti), Hartford, Conn., for plaintiff.

Richard M. Reynolds, Scott P. Moser, Jonathan D. Hatch (Day, Berry & Howard), Hartford, Conn., for defendant.

MEMORANDUM OF DECISION

JOSÉ A. CABRANES, District Judge:

Table of Contents

| | | Page |
|---|---|---|
| INTRODUCTION | | 634 |
| I. | FINDINGS OF FACT | 634 |
| | A. The Parties | 634 |
| | B. The Agreement | 635 |
| | C. The Parties' Business | 636 |
| | D. The Termination of the Agreement | 637 |
| | E. McKeown's Activities Following the Termination | 638 |
| | F. Disposition of the Shares | 638 |
| II. | CONCLUSIONS OF LAW | 639 |
| | A. Breach of Contract | 639 |
| | B. Connecticut Franchise Act | 642 |
| | C. Connecticut Unfair Trade Practices Act | 643 |
| | D. Malicious Interference with Business Relations | 644 |
| | E. Connecticut Anti-Trust Act | 645 |
| CONCLUSION | | 645 |

## Introduction

This action arises from the allegedly unlawful termination by the defendant, a Minnesota corporation, of an exclusive distributorship contract with the plaintiff, a Connecticut corporation. The Complaint (filed Aug. 31, 1982) includes claims based on the Sherman Anti-Trust Act, 15 U.S.C. §§ 1–7, the Connecticut Anti-Trust Act, Conn.Gen. Stat. §§ 35–24 to 35–45, the Connecticut Franchise Act, Conn.Gen.Stat. §§ 42–133e to 42–133h, the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42–110a to 42–110q, breach of contract, and tortious interference with business relations. The plaintiff seeks compensatory damages for loss of profits and loss of business good will, as well as punitive damages and attorney's fees. *See* Complaint ¶ X(A)–(F).

The federal antitrust claim was withdrawn by the plaintiff at the outset of trial. *See* Certified Official Transcript of Proceedings Held January 10, 1985 and January 11, 1985 (filed Jan. 30, 1985) ("Tr.") at 5. Jurisdiction over the remaining counts is predicated on the court's diversity jurisdiction, 28 U.S.C. § 1332.

The action was tried to the bench on January 10 and January 11, 1985. Based on the full record of the case, including the evidence adduced at trial and the memoranda submitted by the parties, the court enters the following findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

## I. FINDINGS OF FACT

### A. *The Parties*

1. The defendant, Gyp-Crete Corp. ("Gyp-Crete" or "the defendant"), of 900 Hamel Road, Hamel, Minnesota, was incorporated under Minnesota law on March 1, 1977. Stipulation of Uncontested Facts (¶ 5 of Final Pretrial Order (filed May 15, 1984)) ("Stip.") ¶ 1. The President of Gyp-Crete is Clyde Jorgensen ("Mr. Jorgensen"). Tr. at 178–179.

2. Since 1977, Gyp-Crete has been in the business of supplying to the construction industry a gypsum cement flooring compound marketed under the trade name

"Gyp-Crete" ("the product"). Stip. ¶ 5. Gyp-Crete also markets items related to the use of the product. *Id.*

3. Gyp-Crete's products are sold primarily through licensed distributors. Tr. 212–213. Gyp-Crete's products are sold to persons and companies licensed to use its products; these persons and companies are called "applicators" or "licensees." Stip. ¶ 5; Plaintiff's Exhibit ("Pl.Ex.") A; Defendant's Exhibit ("Def.Ex.") M. Gyp-Crete does not manufacture the product; it is manufactured to Gyp-Crete's specifications by gypsum manufacturers under contract with Gyp-Crete. Tr. 186.

4. The plaintiff, McKeown Distributors, Inc. ("McKeown" or "the plaintiff"), of 1340 John Fitch Boulevard, South Windsor, Connecticut, was incorporated under Connecticut law on November 20, 1979. Stip. ¶ 2.

5. On November 20, 1979, McKeown issued one hundred (100) shares of its common stock (the "Shares") to Mr. John P. McKeown, Sr. ("Mr. McKeown"), its sole owner and operator. No other shares have ever been issued by McKeown. Stip. ¶ 3.

### B. *The Agreement*

6. Gyp-Crete and McKeown entered into a written distributorship agreement ("the Agreement") on December 20, 1979. Stip. ¶ 8; Pl.Ex. A; Def.Ex. M. Pursuant to the Agreement, McKeown received "the nontransferable right to sell 'Gyp-Crete' brand gypsum cement." Pl.Ex. A; Def.Ex. M. The Agreement defines McKeown's territory or area of primary responsibility as New England and New York State. *Id.* The Agreement was for a period of ten years. *Id.;* Stip. ¶ 8.

7. Paragraph 22 of the Agreement states that the Agreement shall be interpreted and governed by the laws of the state of Minnesota. Pl.Ex. A; Def.Ex. M.

8. The Agreement was the first distributorship agreement entered into by Gyp-Crete. Tr. 195. The Agreement was entered into at Mr. McKeown's behest and only after several meetings and telephone conversations between Mr. McKeown and Mr. Jorgensen. Tr. 191–196. Mr. Jorgensen agreed to permit Mr. McKeown to become a distributor of the product because of Mr. McKeown's extensive contacts in the construction industry in Connecticut and New York State, his plans and enthusiasm for developing a business as a distributor, his success as an applicator of a product previously marketed by Gyp-Crete, and Mr. Jorgensen's satisfaction with the quality of his employees and overall operation. Tr. 191–92, 195–96, 211.

9. The Agreement contained provisions restricting the transfer of ownership or control of McKeown, *see* ¶ 10, *infra,* and restricting the sale, transfer, or assignment of the Shares except to Mr. McKeown's sons Gerald or John, Jr., *see* ¶ 11, *infra.* Pl.Ex. A; Def.Ex. M.

10. Paragraph 14 of the Agreement reads in part as follows:

[I]f a majority of the Distributor's [McKeown's] voting stock is transferred (if the Distributor is a corporation) or its ownership *or control* is in any way substantially changed, the Company [Gyp-Crete] shall have the right to terminate this Agreement. The Agreement may be terminated upon thirty (30) days written notice for any of the reasons aforesaid.

Pl.Ex. A; Def.Ex. M (emphasis supplied).

11. Paragraph 15 of the Agreement reads in full as follows:

This Agreement may be assigned by [Gyp-Crete] and the performance of its duties thereunder delegated. This Agreement shall not be assigned by the Distributor nor the performance of its duties thereunder delegated except exclusively under the following circumstances:

(A) By assignment to either JOHN JR McKeown or GERALD McKeown, or both of them, the said JOHN JR McKeown and GERALD McKeown being the two sons of John McKeown.

(B) The prior written consent of [Gyp-Crete].

Any sale, transfer, or other assignment of more than ten percent (10%) of the corporate stock of the Distributor,

636

should the Distributor be a corporation, shall be considered an assignment of this Distributorship for purposes of this Agreement.

Pl.Ex. A; Def.Ex. M.

12. Due to its concerns about quality control in the use of the product, Gyp-Crete originally intended to have a completely non-transferable agreement. Tr. 209–211. Provisions permitting limited transfers (to Gerald McKeown and/or John McKeown, Jr.) were included in the Agreement at Mr. McKeown's behest solely because of his hope, expressed to Mr. Jorgenson, that he could reconcile with his estranged children, involve them in the business and leave the business to them. *Id.*

13. The parties to the Agreement intended that McKeown would at no time be operated or controlled by anyone other than Mr. McKeown, his son John Jr., or his son Gerald. *Id.*

C. *The Parties' Business*

14. The product is a lightweight gypsum cement that is used to create a floor surface upon which carpet or tile is placed. Tr. 181–183. The product has advantages over its competitors because it is lightweight, it flows easily and can be levelled easily, and it has a pleasant appearance. *Id.* In order to have these properties, the product must be mixed properly with water and sand at the construction site. Tr. 187. The proper ratios of water and sand are critical to the successful use of the product, and slight variations can deprive the product of its advantageous properties. *Id.*

15. Because proper mixing and installation are essential to the successful use of the product, *see* ¶ 14, *supra*, Gyp-Crete is greatly concerned about the quality of the product and the competence and experience of its distributors and applicators. Tr. 187, 205–206, 215–218, 266–67. Gyp-Crete's primary activity is controlling the quality of the product as it is delivered from the manufacturer and as it is applied at the construction site. *Id.*

16. In order to control quality, Gyp-Crete maintains a testing laboratory and sends quality control inspectors into the field to check applications of the product at individual construction sites. Tr. 187, 217–218.

17. As a distributor of the product, McKeown received orders for the product from its customers, who were licensed applicators. Tr. 28–30. McKeown, in turn, ordered the product from Gyp-Crete, which shipped the product directly to McKeown's customers. Tr. 29. Gyp-Crete would bill McKeown, which would then bill its customers, adding a distributor's commission. Tr. 30. In addition to distributing the product, Mr. McKeown consulted with his customers on problems that they were experiencing in their use of the product. When applicators experienced problems with the product, Mr. McKeown would travel to the construction site to assist in resolving the problem. Tr. 31.

18. During all relevant times, McKeown had three customers: Gypsum Floors of New England, Inc., Acoustical Gypsum Floors of New York, and Acoustical Gypsum Floors, Inc. Stip. ¶¶ 36, 37; Tr. 27, 89, 101.

19. Until January 1981, Gypsum Floors of New England was owned by Mr. McKeown. *Id.* In January 1981, Mr. McKeown sold Gypsum Floors of New England to Veilleux and Sons. Tr. 28.

20. McKeown executed contracts with each of its three customers. Stip. ¶¶ 36, 37; Tr. 27, 89, 101; Def.Ex. K. These contracts specified the distributor's commission that could be charged by McKeown for its services. *Id.*

21. Paragraph 2(B) of McKeown's contracts with each of its customers contained a clause providing that if McKeown sold the product to anyone other than the particular customer within the customer's defined territory, McKeown would pay to the customer in whose geographic territory the sale was made "90% of an amount equal to the sales price received by Distributor (McKeown) on any such sale or sales less its cost." Tr. 89, 101; Def.Ex. K. This clause acted as a strong economic disincen-

tive against McKeown developing any additional customers. Tr. 89, 101.

22. At no time did McKeown sell the product to any entity or person other than Gypsum Floors of New England, Inc., Acoustical Gypsum Floors of New York, and Acoustical Gypsum Floors, Inc. Stip. ¶ 37. All of McKeown's sales were made, and, if continued, would have been made pursuant to the contracts between each of these customers and McKeown. Stip. ¶ 39.

23. The agreements between McKeown and its customers were conceived and drafted by McKeown. Tr. 214. Gyp-Crete had no involvement in the preparation, negotiation, or execution of such agreements. *Id.* Gyp-Crete did not learn of the terms of such agreements until after Mr. McKeown's death. *Id.*

24. From 1979 until 1981, McKeown was operated by Mr. McKeown. His fiancee, Diane B. Cyr ("Ms. Cyr") was an officer of the corporation, and she worked part-time for McKeown, handling bookkeeping and clerical tasks. Tr. 26–28.

25. Mr. McKeown handled all technical and quality control aspects of applying Gyp-Crete flooring. Tr. 59. Ms. Cyr was not familiar with the actual application of the product and the problems related thereto. Tr. 55, 57–58. Although she often accompanied Mr. McKeown on visits to construction sites, she did not participate in Mr. McKeown's efforts to assist McKeown's customers in resolving problems relating to the use of the product. She did not participate in the negotiation of contracts with any of McKeown's customers, nor was she familiar with the terms of those contracts. Tr. 73–74.

26. None of Mr. McKeown's children took any significant interest in the business or any role in the business prior to his death. Tr. 35. Neither John McKeown, Jr. nor Gerald McKeown had sufficient familiarity with the construction industry or the product to manage the business. Tr. 171–174.

27. During the course of their contractual relationship, Gyp-Crete did not control the commissions charged by McKeown, monitor McKeown's financial status, solicit customers for McKeown, monitor McKeown's solicitation of customers, direct McKeown's hiring, or require Mr. McKeown to attend specific trade shows. Tr. 190–191, 196, 216, 219, 225. Gyp-Crete had no right under the Agreement to prescribe McKeown's hours of operation, audit McKeown's books, set McKeown's prices, or establish sales quotas for McKeown. *See* Pl.Ex. A; Def.Ex. M. Gyp-Crete provided no financial support to McKeown. While Gyp-Crete sold equipment suitable for the application of Gyp-Crete flooring, Gyp-Crete did not require its applicators to use the equipment, and McKeown did not do so. Tr. 187–189. Although Gyp-Crete had the right to review McKeown's advertisements, Gyp-Crete reserved this right for the purpose of protecting its trademark. Tr. 223–225. Gyp-Crete never prescribed advertising for McKeown, and Gyp-Crete never disapproved any advertisement of McKeown. *Id.*

28. McKeown's principal marketing plan was to sell the product to its three customers pursuant to the contracts executed with those customers. *See* ¶ 20, *supra.* McKeown's principal means of advertising the product was distributing paperweights made of Gyp-Crete flooring compound, and mailing to customers newspaper clippings relating to buildings that were due to be rehabilitated or that had been gutted by fire. Tr. 211–212. Gyp-Crete neither suggested nor directed these efforts. *Id.*

29. Gyp-Crete distributors in other states used widely differing marketing strategies, including solicitation of architects and job superintendents, mass mailings, and seminars for prospective customers. Tr. 215.

### D. *The Termination of the Agreement*

30. In October 1980, Mr. McKeown suffered a heart attack. Tr. 33. In January 1981, Mr. McKeown sold Gypsum Floors of New England, and moved his home and the distributorship from South Windsor, Connecticut to Cape Cod, Massachusetts. Tr.

219–222. He died on July 3, 1981. Stip. ¶ 33.

31. Due to his weakened physical condition after the heart attack, Mr. McKeown was much less active as a Gyp-Crete distributor. Tr. 35. During the time immediately prior to and after Mr. McKeown's death, the distributorship was operating in the passive role of processing invoices reflecting purchases by McKeown's customers from Gyp-Crete. Tr. 43. Ms. Cyr may have been capable of continuing this invoice-processing activity, but a limited operation of that sort was not the arrangement envisaged by the parties to the Agreement.

32. By letter dated August 5, 1981, Gyp-Crete notified McKeown that it was terminating the Agreement "pursuant to paragraphs 14 and 15 of the Distributorship Agreement." Stip. ¶ 14; see Stip. ¶¶ 13, 15; Pl.Ex. H; ¶¶ 8–11, supra. The letter stated that the Agreement would be terminated thirty days from the date of the letter. Stip. ¶ 13. Gyp-Crete made the decision to terminate the Agreement unilaterally and without consulting McKeown's customers. Tr. 237; Pl.Ex. F, H.

33. After notifying McKeown that it was terminating the Agreement, Gyp-Crete notified McKeown's customers that McKeown was no longer Gyp-Crete's distributor. Tr. 238; Pl.Ex. F. Gyp-Crete then offered to supply the product to McKeown's former customers, and Gyp-Crete assumed the role of distributor for its product in McKeown's former distributorship territory. Tr. 238–239. Gyp-Crete quality control teams visited McKeown's former customers to assist them in their use of the product. Id. Gyp-Crete charged McKeown's former customers approximately 20 percent less than they had been charged by McKeown. Id.

34. Gyp-Crete replaced McKeown with another distributor in March 1982. Tr. 238–240.

### E. McKeown's Activities Following the Termination

35. Prior to the death of Mr. McKeown on July 3, 1981, the only employees and officers of McKeown were Mr. McKeown and Ms. Cyr; the latter worked only part time. Stip. ¶ 33; see ¶ 24, supra.

36. After Mr. McKeown's death, Ms. Cyr, McKeown's only officer, hired Henry L. Ledbetter ("Mr. Ledbetter") to solve quality control problems and to operate the business. Tr. 43, 45. Mr. Ledbetter had never worked for McKeown prior to the death of Mr. McKeown, and he had never before worked with the Gyp-Crete product. Stip. ¶¶ 31–32; Tr. 157, 181, 236–237.

37. On October 29, 1981, McKeown entered into separate employment contracts with Ms. Cyr, Mr. Ledbetter and Gerald McKeown. These contracts ran until 1989, when the distributorship would have ended under the Agreement, and they were not terminable by either party. Stip. ¶¶ 40–42; Def.Ex. A, B, T.

38. The contracts of Ms. Cyr and Mr. Ledbetter gave each 40% of McKeown's pre-tax profits; Gerald McKeown's contract gave him 20% of McKeown's pre-tax profits. Id. Ms. Cyr's contract also provides that she would receive 80% of the first $100,000 of any settlement to result from this action and 60% of any amount over $100,000. Id.

39. Since 1981, Ms. Cyr has accepted other employment, Mr. Ledbetter has retired by choice (and in accordance with his original plan), and Gerald McKeown has by choice been attending school. Tr. 80–82, 165, 173.

### F. Disposition of the Shares

40. At the time of his death, Mr. McKeown was a resident of Barnstable County, Massachusetts. At his death, Mr. McKeown owned 99 of the 100 outstanding Shares. The other Share was owned by Ms. Cyr. Stip. ¶ 9.

41. Mr. McKeown was survived by his four children, John P. McKeown, Jr., Gerald B. McKeown, Patricia McKeown, and Brian McKeown, and his two grandchildren, Heather and Sean, who are the children of John P. McKeown, Jr. Stip. ¶ 10.

42. Mr. McKeown left a Last Will And Testament dated January 6, 1981 (the "Will"), which was admitted to probate in Barnstable County, Massachusetts. Stip. ¶ 11; Def.Ex. N. The Will bequeathed Mr. McKeown's shares to Ms. Cyr. Stip. ¶ 12.

43. After Gyp-Crete notified McKeown of its termination of the Agreement, Ms. Cyr executed a disclaimer of her interest in the Shares. The disclaimer was filed in the Registry of Probate in Barnstable County, Massachusetts on January 4, 1982. Stip. ¶ 18.

44. If Ms. Cyr's disclaimer is invalid, she owns Mr. McKeown's stock in McKeown. Stip. ¶ 12. If Ms. Cyr's disclaimer is valid, the Shares will pass under the terms of the Will as if she had predeceased Mr. McKeown. Def.Ex. N. If Ms. Cyr had predeceased Mr. McKeown, the Shares would be added to the residue of Mr. McKeown's estate. *Id.*

45. Article SECOND of the Will bequeathed the residue of Mr. McKeown's estate to the trustees under the "John P. McKeown Trust" (the "Trust") under a trust agreement entered into on September 23, 1975, between Mr. McKeown as Settlor and Lester Katz, Arne H. Dalene and Mr. Ledbetter as original trustees. Stip. ¶ 19.

46. The Trust originally excluded Gerald McKeown as a beneficiary. Thereafter, documents were signed purporting to amend the Trust to provide that its corpus should be divided into 4 equal shares, one for each of Mr. McKeown's children. The Trust has always provided that the share of each Trust beneficiary who had not reached age 35 was to be held in trust, and distributed in equal thirds at ages 25, 30 and 35. Stip. ¶ 20.

47. Three of Mr. McKeown's children, John, Jr., Patricia and Brian McKeown, executed disclaimers of their interests in the Shares both as beneficiaries of the Trust and as heirs or beneficiaries under the Will, which disclaimers were filed in the Registry of Probate in Barnstable County, Massachusetts on January 4, 1982. Stip. ¶ 21.

48. If the disclaimers by Mr. McKeown's children are invalid, the Shares will be held for them under Article FIFTH of the Trust. Def.Ex. O. If the disclaimers by Mr. McKeown's children are valid, the disclaimed interests will pass as if the disclaimants had predeceased Mr. McKeown. *Id.*

49. The Trust provides in Article FIFTH (a) that the proposed distribution to a deceased child of Mr. McKeown is to be held in trust for the deceased child's issue. Def.Ex. O.

50. As of March 3, 1984, John P. McKeown, Jr. was twenty-seven years old, Gerald B. McKeown was twenty-six years old, Patricia McKeown was twenty-five years old and Brian McKeown was twenty-one years old. Stip. ¶¶ 22–25.

51. As of March 3, 1984, John P. McKeown, Jr.'s child Heather was four years of age and John P. McKeown Jr.'s child Sean was just under three years of age. Stip. ¶ 26.

52. Mr. McKeown's four children and his two grandchildren are all Mr. McKeown's issue. Stip. ¶ 27.

53. The Shares remain today in the hands of the executors of Mr. McKeown's estate. Stip. ¶ 45.

## II. CONCLUSIONS OF LAW

### A. *Breach of Contract*

■ Count Two of the Complaint states a claim against Gyp-Crete for common law breach of contract. In this count, McKeown alleges that Gyp-Crete's refusal to honor the Agreement was wrongful, because no event had occurred authorizing Gyp-Crete to cease performance under the Agreement.

McKeown's claim appears spurious in light of paragraph 14 of the Agreement, which lists, among other events triggering Gyp-Crete's right to terminate the Agreement, the transfer of a majority of McKeown's stock or a substantial change in the ownership or control of McKeown. *See* Findings of Fact ¶ 10, *supra.* It can-

not reasonably be disputed that, following the death of Mr. McKeown, a "substantial change" in the control of McKeown occurred. McKeown was virtually a one-man operation from the time the Agreement was executed until October 1980, when Mr. McKeown suffered a heart attack. *Id.* at ¶¶ 24, 25, 31. Mr. McKeown's only assistance in operating the distributorship came from Ms. Cyr, who handled only bookkeeping and clerical tasks. *Id.* If Mr. McKeown's death was not a substantial change in the operation of McKeown, it is difficult to imagine what event would constitute a substantial change in violation of paragraph 14.

In all other respects, Gyp-Crete's termination of the Agreement as a result of the change in McKeown's control was fully authorized by the Agreement. It is uncontested that Gyp-Crete gave McKeown thirty days' written notice of the termination, as required by paragraph 14. *Id.* at ¶¶ 10, 32; Tr. 47. The Agreement places no other limitations or obligations on Gyp-Crete's exercise of its right to terminate the distributorship.

The plaintiff offers two reasons why the court may not rely on paragraph 14 as a justification for Gyp-Crete's termination of the Agreement. First, McKeown argues that any reliance on paragraph 14 is inappropriate because Gyp-Crete's notice to McKeown of the termination states that the reason for the action was McKeown's breach of paragraph 15. Thus, concludes McKeown, any reliance on paragraph 14 is "mere subterfuge." Plaintiff's Post Trial Brief (filed Mar. 7, 1985) ("Plaintiff's Brief") at 13.

The plaintiff's argument suggests that Gyp-Crete was under some obligation to explain to McKeown the reasons for its termination. In fact, no such obligation existed under the Agreement. The plaintiff has failed to identify any authority for the proposition that, absent a contractual obligation, a party choosing to exercise its right to terminate a contract must notify the other party of its reasons for doing so. In any event, Gyp-Crete's letter to McKeown of August 5, 1981 does refer to paragraph 14, *see* Findings of Fact ¶ 32, *supra,* and McKeown clearly was aware that the termination was prompted by the death of the founder, operator, and 99% owner of McKeown.

McKeown also contends that the court should ignore paragraph 14 in its entirety, because the prohibition in paragraph 14 on the transfer of a majority of McKeown's stock conflicts with paragraph 15, which permits Mr. McKeown to assign the Shares to his sons Gerald and John Jr. Applying the proposition that, where two conflicting provisions in a contract apply to the same conduct, the more specific provision controls, *see* 3 Corbin, *Contracts,* § 547, at 172–178 (rev. ed. 1971), McKeown argues that paragraph 15 is the more specific provision and, consequently, paragraph 14 should be ignored.

■ The law requires that, whenever reasonably possible, courts should interpret contract language so as to reconcile arguably contradictory clauses. *See State Farm Mutual Automobile Insurance Co. v. Hedberg,* 236 F.Supp. 797, 801 (D.Minn. 1964) (applying Minnesota law), *aff'd,* 350 F.2d 924 (8th Cir.1965); Corbin, *supra,* at 173 n. 17.[1] Contracts should be read to minimize conflicts, and one clause should yield to another only where the two are unmistakably inconsistent. *Id.* Applying this rule to the Agreement, it is apparent that a conflict between paragraphs 14 and 15 exists only when triggered by one event—the transfer of the Shares or control of McKeown to Gerald McKeown or John McKeown, Jr. Since that event did not occur, the court can and must give full effect to both paragraphs, and paragraph 14 must be read to mean exactly what it

---

1. Minnesota law apparently is applicable to this action, by virtue of the choice of law provision contained in the Agreement. *See* Findings of Fact ¶ 7, *supra.* The plaintiff repeatedly has stated that the substantive law of Minnesota applies to its breach of contract claim, *see* Plaintiff's Trial Brief (filed Jan. 3, 1985) at 3; Plaintiff's Post Trial Brief (filed Mar. 7, 1985) at 5, 10; since the defendant has never contested this point, it is presumed to agree.

says—that *any* substantial change in the control of McKeown, such as that which occurred upon Mr. McKeown's death, triggers Gyp-Crete's right to terminate the distributorship. *See Medtronic, Inc. v. Catalyst Research Corp.*, 518 F.Supp. 946, 951 (D.Minn.) (applying Minnesota law) ("In construing the contract, the words must be given their plain and ordinary meaning ... and *each* word of the contract should be given effect whenever possible" [emphasis in original]), *aff'd*, 664 F.2d 660 (8th Cir. 1981). The plaintiff has identified no authority in the law of Minnesota or any other arguably relevant jurisdiction that would permit the court to read out of the contract paragraph 14 in its entirety, merely because in one circumstance—the transfer of shares to Gerald and John Jr.—paragraph 15 would create an exception to the general rule of paragraph 14.

This interpretation of paragraphs 14 and 15 is based upon the language of the Agreement alone. However, it amply is supported by evidence presented at trial concerning the intent of the parties in drafting the clauses at issue. The defendant presented uncontroverted testimony that the parties intended and understood that Gyp-Crete's continued performance under the Agreement was conditioned upon Mr. McKeown's continued involvement in, and ownership of, McKeown. *See* Findings of Fact ¶ 13, *supra.* The provision concerning Gerald McKeown and John McKeown, Jr. was added at Mr. McKeown's request and was intended *solely* to permit Mr. McKeown to train one of his sons in the business and, ultimately, leave the business to him. *Id.* at ¶ 12. Inclusion of this provision in paragraph 15 clearly was not intended to vitiate the effect of paragraph 14.

■ McKeown claims that the parol evidence rule bars the court's consideration of extrinsic evidence as to the parties' intent in drafting the Agreement.[2] *See* Plaintiff's Brief at 19–20. However, it is the plaintiff's argument, rather than the defendant's, that relies on arguable ambiguities in the Agreement. The plaintiff contends that paragraphs 14 and 15 are contradictory and that, as a result, the court should read paragraph 14 out of the Agreement. A contract containing facially incompatible terms inherently is ambiguous, and parol evidence is admissible to ascertain the parties' intent at the time of contracting. *Medtronic, Inc. v. Catalyst Research Corp., supra*, 518 F.Supp. at 951. Furthermore, the plaintiff suggests that the prohibition on "any ... substantial change" in the control of McKeown, *see* Findings of Fact ¶ 10, *supra*, does not bar the substantial change that indisputably has occurred here. For a prohibition on "any substantial change" not to apply to this particular change, the Agreement must be ambiguous, and resort to parol evidence is appropriate. *See id.; RJM Sales & Marketing, Inc v. Banfi Products Corp.*, 546 F.Supp. 1368, 1374 (D.Minn. 1982) (applying Minnesota law). If the plaintiff is incorrect and the prohibition on "any substantial change" does bar this change, the court need not have reached the question of the admissibility of parol evidence. In any event, it is unnecessary for the court to resort to parol evidence to find that Gyp-Crete's termination of the distributorship was authorized by the Agreement.

In light of the court's conclusion that Gyp-Crete's termination of the Agreement was authorized pursuant to paragraph 14 of the Agreement, McKeown's claim for

**2.** Under Minnesota law, *see* note 1, *supra*, the parol evidence rule is a rule of substantive law prohibiting the admission of parol evidence to vary or contradict the language of a complete and unambiguous written agreement. *RJM Sales & Marketing v. Banfi Products Corp.*, 546 F.Supp. 1368, 1374 n. 5 (D.Minn.1982); *Flynn v. Sawyer*, 272 N.W.2d 904, 908 (Minn.1978). Parol evidence is admissible to vary or contradict the terms of a written contract if the agreement is incomplete or ambiguous. *Id.; see also* 3 Corbin, *Contracts* § 573, at 357–358 (rev. ed. 1971) ("When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing").

breach of contract must fail. Therefore, it is unnecessary for the court to determine whether paragraph 15 provided an additional basis for Gyp-Crete's termination of the Agreement.

### B. Connecticut Franchise Act

Count Three of the Complaint is a claim under the Connecticut Franchise Act, Conn. Gen.Stat. § 42–133e to 42–133h, which defines a franchise as

> an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor. . . .

Conn.Gen.Stat. § 42–133e(b). Under Connecticut law, a franchisor must give the franchisee sixty days' notice of the termination of the franchise, and may only terminate the franchise for "good cause." Conn.Gen.Stat. § 42–133f(a).

■ McKeown has failed to establish that it operated under a "marketing plan or system prescribed in substantial part" by Gyp-Crete. McKeown's marketing plan appears to have consisted of identifying and contracting with its three customers, and encouraging those three customers to increase their use of the product. *See* Findings of Fact ¶¶ 18–22, 28, *supra.* McKeown did not attempt to solicit any additional customers, and paragraph 2(B) of the contracts between McKeown and its customers acted as a disincentive for McKeown to do so. *Id.* at ¶ 21. Gyp-Crete never prescribed such a marketing plan, nor would it have any reason to prescribe a plan that created a disincentive for McKeown to develop new customers.[3] In fact, Gyp-Crete became aware of this disin-

centive to new business only after Mr. McKeown's death. *Id.* at ¶ 23. In addition, while Gyp-Crete retained the right, under paragraph 5(D) of the Agreement, to approve McKeown's advertising, Gyp-Crete had no right to prescribe any particular advertising for McKeown. The right of a manufacturer to approve or disapprove a distributor's advertising does not, without substantially more, prove the existence of a franchise. *See Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Sup. 495, 452 A.2d 123, 125 (1982) (no franchise found where alleged franchisor had right to approve other party's advertising and prescribe its hours of operation and minimum number of employees).

■ A review of cases in which a franchise relationship was found to exist supports the court's conclusion that no such relationship existed between Gyp-Crete and McKeown. Among the factors identified by other courts as relevant to the existence of a franchise are the manufacturer's right to dictate the distributor's advertising, *see Carlos v. Philips Business Systems, Inc.,* 556 F.Supp. 769, 777 (E.D.N.Y.) (construing Connecticut Franchise Act), *aff'd,* 742 F.2d 1432 (2d Cir.1983), to dictate the number of the distributor's employees, *see id.,* to set the prices charged by the distributor, *see Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), and to audit the distributor's books, *see Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978). Other factors suggesting the existence of a franchise are that the alleged franchisor sets sales quotas for the alleged franchisee, provides management training and financial support, and hires the franchisee's employees. *Consumers Petroleum of Connecticut v. Duhan, supra,* 452 A.2d at 125. None of these factors are present in this case. Nor does the Agreement refer to the relationship between Gyp-Crete and McKeown as a "franchise." *See Jenkins v. Haworth,*

---

**3.** This disincentive arguably is inconsistent with McKeown's obligation under paragraph 5(E) of the Agreement to "actively solicit . . . applica-

tions by persons and companies to become licensees." *See* Pl. Ex. A; Def. Ex. M.

*Inc.,* 572 F.Supp. 591, 600 (W.D.Mich.1983) (absence of term "franchise" in agreement between parties is relevant, although not determinative, of non-existence of franchise for purposes of Connecticut Franchise Act).

Accordingly, the court finds that the relationship between Gyp-Crete and McKeown was not a "franchise" pursuant to the Connecticut Franchise Act. In any event, a contrary conclusion would not have entitled Gyp-Crete to the damages sought in the Complaint. Since McKeown's breach of the Agreement would have constituted "good cause" to terminate a franchise; Gyp-Crete's only arguable violation of the Connecticut Franchise Act would be its failure to give McKeown sixty days' advance notice of the termination.[4] *See* Conn.Gen.Stat. § 42–133f(a). Such a violation at most would entitle McKeown to recover lost profits for the thirty additional days it would have been in operation prior to the date that termination would be permitted under the Connecticut Franchise Act.

### C. *Connecticut Unfair Trade Practices Act*

■ Count Four of the Complaint is a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. §§ 42–110a to 42–110q, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). The plaintiff has neither alleged nor demonstrated that Gyp-Crete engaged in any "deceptive" act; it claims, rather, that Gyp-Crete's termination of the Agreement was "unfair." *See* Plaintiff's Brief at 28.[5]

---

**4.** "Good cause" for terminating a franchise includes, but is not limited to, "the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement." Conn.Gen.Stat. § 42–133f(a). McKeown's breach of Paragraph 14 of the Agreement would constitute such a refusal or failure.

**5.** The parties' election to have the law of Minnesota govern the Agreement, *see* Findings of Fact ¶ 7; note 1, *supra,* does not affect the availability to the plaintiff of a claim under the Connecticut Unfair Trade Practices Act ("CUT-

■ CUTPA specifically provides that in construing Section 42–110b(a), the state courts "shall be guided by interpretations given by the Federal Trade Commission and the federal courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1) ), as from time to time amended." Conn.Gen.Stat. § 110b(b). In keeping with this command, the Connecticut Supreme Court has adopted the following factors, which were developed by the Federal Trade Commission, to determine whether a practice is "unfair":

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Ivey, Barnum & O'Mara v. Indian Harbor Properties, Inc.,* 190 Conn. 528, 539 n. 13, 461 A.2d 1369, 1374 (1983) (Peters, J.), *quoting FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972); *see Sportsmen's Boating Corp. v. Hensley,* 192 Conn. 747, 756, 474 A.2d 780, 786 (1984) (reciting and employing same factors). It follows that federal courts called upon to construe CUTPA also should look for guidance to decisions interpreting Section 5(a)(1) of the Federal Trade Commission Act. *See Bailey Employment System, Inc. v. Hahn,* 655 F.2d 473, 477–478 (2d Cir.1981).[6] The court

---

PA"). *See R & R Associates of Connecticut v. Deltona Corp.,* Civil No. H 80–240 (D.Conn. May 19, 1982) (oral ruling) (holding that CUTPA claim is available to plaintiff despite choice of law provision in agreement specifying applicability of Florida law). The defendant does not contend that the choice of law provision has any bearing on the availability in this action of a CUTPA claim.

**6.** This conclusion flows from the well-established proposition that, in deciding a question of state law, a federal court whose jurisdiction is based upon diversity of citizenship should at-

already has found that Gyp-Crete terminated the Agreement for good cause, pursuant to the terms of the Agreement itself. Accordingly, there can be nothing unfair or deceptive either in Gyp-Crete's termination of the Agreement, or in its offer, made only *after* the termination, to supply the product directly to McKeown's former customers.[7] *See* Findings of Fact ¶ 33, *supra.*

### D. *Malicious Interference with Business Relations*

The Sixth Count of the Complaint alleges that Gyp-Crete "coerced, induced or persuaded the plaintiff's customers to cease doing business with the plaintiff" and that such conduct constitutes "tortious interference with the Plaintiff's advantageous business relations." Complaint ¶¶ 82–95.

■ To establish a claim under Connecticut law for tortious interference with business relations or expectancies, a plaintiff must prove that the defendant engaged in "fraud, misrepresentation, intimidation, obstruction or molestation," *Skene v. Carayanis*, 103 Conn. 708, 714, 131 A. 497 (1926), or that the defendant "acted maliciously." *Jones v. O'Connell*, 189 Conn. 648, 660, 458 A.2d 355, 361 (1983); *Goldman v. Feinberg*, 130 Conn. 671, 675, 37 A.2d 355, 356 (1944); *see also Busker v. United Illuminating Co.*, 156 Conn. 456, 461, 242 A.2d 708, 711 (1968) ("The essential elements of this cause of action are: (1) the defendant's conduct was tortious in that it was fraudulent; and (2), as a proximate consequence of that fraudulent conduct, the plaintiff

suffered actual loss, as alleged, in being deprived of an opportunity which he would otherwise have had").

■ To some extent, the court's ruling on McKeown's CUTPA claim is determinative of this claim as well. As the Connecticut Supreme Court has observed,

> CUTPA has come to embrace a much broader range of business conduct than does the common law tort action [of interference with business expectancies]. . . .
>
> . . . Conduct that might be actionable under CUTPA may not rise to a level sufficient to invoke tort liability. The reverse of that proposition, however, is seldom true.

*Sportsmen's Boating Corp. v. Hensley, supra*, 192 Conn. at 756, 474 A.2d at 786.

The plaintiff has failed to demonstrate that Gyp-Crete engaged in any conduct arguably constituting tortious interference with business relations. Following its lawful termination of the Agreement, Gyp-Crete offered to supply the product directly to McKeown's former customers. *See* Findings of Fact ¶¶ 33–34, *supra.* Gyp-Crete did so for many months after the termination, until it entered into an agreement with a new distributor. *Id.* Gyp-Crete's sales of its product to willing customers after the lawful termination of the Agreement hardly can be characterized as fraudulent or malicious conduct.

tempt to ascertain how the relevant state's highest court would rule. *See Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 209, 76 S.Ct. 273, 279, 100 L.Ed. 199 (1956) (Frankfurter, J., concurring); *Cunninghame v. The Equitable Life Assurance Society of the United States*, 652 F.2d 306, 308 (2d Cir.1981).

7. Although McKeown does not raise this question, it is arguable that a cause of action under CUTPA may be established by proof that a business practice of the defendant has caused a substantial injury to the plaintiff that outweighs the benefits to consumers arising from that practice. *See McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 569–571, 473 A.2d 1185, 1192 (1984) (*"McLaughlin"*). In apparent dicta in *McLaughlin, supra*, the Connecticut Su-

preme Court seemed to suggest that a practice may be prohibited by CUTPA even though it meets only one of the criteria identified in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972). However, even if this court were convinced that CUTPA prohibits an otherwise lawful and fair business practice merely because the practice results in substantial injury to competitors without a corresponding benefit to consumers (and that is far from clear), the plaintiff in this case has failed to prove that the injury to the plaintiff outweighs the benefits reaped by its former customers as a result of receiving the Gyp-Crete product from Gyp-Crete at a substantially lower price than they had been charged by McKeown. *See* Findings of Fact ¶ 34, *supra.*

### E. *Connecticut Anti-Trust Act*

Count Five of the Complaint is a claim under the Connecticut Anti-Trust Act, Conn.Gen.Stat. §§ 35–24 to 35–45. Specifically, McKeown alleges that Gyp-Crete's conduct in terminating the Agreement and supplying the product to McKeown's former customers is a violation of Section 35–28(d), which declares unlawful any "contract, combination and conspiracy" that has the purpose or effect of "refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person." Conn.Gen.Stat. § 35–28(d).

It is well-settled that an individual or corporation cannot alone contract, combine, or conspire to violate the antitrust laws. Thus, "a violation of Section 35–28 ... requires a plurality of actors." *Shea v. First Federal Savings & Loan Association of New Haven,* 184 Conn. 285, 306, 439 A.2d 997, 1007 (1981); Brodigan, The Connecticut Antitrust Act, 47 Conn.B.J. 12, 16 (1973); R. Bork, *The Antitrust Paradox* 330–346 (1978) (federal antitrust law principles). No antitrust violation exists where a manufacturer unilaterally elects to exercise its rights under a distributorship agreement to terminate that agreement; nor does any violation occur when, after the termination, the manufacturer informs the former customers of the terminated distributor that they can place orders directly with the manufacturer. *See Monsanto Co. v. Spray-Rite Services Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) ("A manufacturer of course has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently"); *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir.1975) ("[I]t is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business").

The court already has determined that Gyp-Crete unilaterally terminated the Agreement. *See* Findings of Fact ¶ 32, *supra.* There was no contract or agreement between Gyp-Crete and any of McKeown's customers until *after* McKeown was notified of the termination of the Agreement. *Id.* at ¶ 33. These findings preclude any conclusion that Gyp-Crete violated Section 35–28.

The Complaint also states a claim pursuant to Conn.Gen.Stat. § 35–27, which declares unlawful any "contract, combination or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce." Complaint ¶ 80(a), (b), (d), (e). There is no mention of Section 35–27 in the Plaintiff's Brief, and it is assumed that McKeown has abandoned this claim. In any event, McKeown presented no evidence at trial on the issue of Gyp-Crete's attempts to achieve a monopoly, and there is no basis upon which the court could find Gyp-Crete in violation of Section 35–27.

### *Conclusion*

For the reasons stated above, the court finds that the plaintiff has failed to carry the burden of proof on any count of the Complaint. Accordingly, the defendant is entitled to an entry of judgment in its favor. Judgment shall enter forthwith.

It is so ordered.