**Robert SORISIO, d/b/a Connecticut Handbag and Luggage Company**

v.

**LENOX, INC., Successor to Hartmann Luggage Company.**

Civ. No. B84–634(EBB).

United States District Court, D. Connecticut.

May 26, 1988.

Beverly Stauffer Knapp, L. Douglas Shrader, Zeldes, Needle & Cooper, Bridgeport, Conn., for plaintiff.

William R. Murphy, Sara Church Dinkler, Tyler Cooper & Alcorn, New Haven, Conn., for defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

ELLEN B. BURNS, District Judge.

The plaintiff, Robert Sorisio, owner and operator of the Connecticut Handbag and Luggage Company ["Connecticut Handbag"], brought this suit against the defendant, Lenox, Inc., seeking injunctive and monetary relief. Sorisio alleges that the defendant engaged in an unlawful price fixing scheme, and that it wrongfully terminated Connecticut Handbag as an authorized dealer for Hartmann Luggage. The plaintiff alleges violations of federal and state antitrust laws, 15 U.S.C. § 1, Conn. Gen.Stat. §§ 35–24 et seq. (Count One), the Connecticut Franchise Act, Conn.Gen.Stat. §§ 42–133e et seq. (Count Two), and the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42–110a et seq. (Count Three). Jurisdiction in this court is under 28 U.S.C. § 1331. The defendant has moved for summary judgment on all three claims. For the following reasons, the defendant's motion is granted.

FACTS

Plaintiff owns and operates two retail stores in Bridgeport and Norwalk, Connecticut ["Connecticut Handbag"], which offer for sale a variety of luggage, business cases, handbags, and accessories. Third Amended Complaint ¶ 6 ["Complaint"]. These products vary in price and quality from moderately priced brands to the most expensive and prestigious brands in the retail luggage industry. Id. Plaintiff aggressively markets this merchandise, purportedly by offering discounts of between twenty and thirty percent off of the manufacturers' suggested retail prices. Id. ¶ 7. Defendant, Lenox, Inc., the surviving entity in a merger with Hartmann Luggage Company ["Hartmann Luggage"], manufactures and sells "luggage, business cases, and accessories of the highest grade and quality." Id. ¶ 8.

Plaintiff sought to become a Hartmann dealer. In response to his inquiry, the defendant conducted an inspection of plaintiff's properties and performed a credit check in April, 1982. Id. ¶ 13. Plaintiff alleges that he was approved as a dealer, and that he wrote his first order as an authorized Hartmann dealer in February, 1983. Id. ¶ 14.

Sorisio claims that he enjoyed great success in marketing Hartmann's products, apparently at the expense of competing Hartmann dealers, who allegedly lost business when they refused to meet the prices at Connecticut Handbag. Id. ¶ 18. Plaintiff alleges that his competitors lodged complaints and demands with Hartmann Luggage seeking price stabilization. Id. ¶ 19. Plaintiff further alleges that Hartmann Luggage agreed with its retail dealers to fix the retail prices of its products in Connecticut. Id. ¶ 20. In the complaint, plaintiff claims that Hartmann's response to

these complaints was two-fold. Allegedly, it implemented a discriminatory supply policy by refusing to provide Connecticut Handbag with its new luggage lines, *id.* ¶¶ 21–23, and it then terminated Sorisio as an authorized dealer, *id.* ¶¶ 24–25. In his Memorandum in Opposition to Defendant's Motion for Summary Judgment ["Opposition Memorandum"], the plaintiff claims that the defendant instituted several retaliatory measures. Plaintiff alleges that Hartmann Luggage coerced the plaintiff into complying with a price-fixing policy, that it refused to sell its new lines of luggage to the plaintiff, that it denied the plaintiff a sales representative after June, 1983, and that it eventually terminated the plaintiff as an authorized dealer. *Id.* at 11–15.

DISCUSSION

A. *Count One—Federal and State Antitrust Claims*

■ Section one of the Sherman Antitrust Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1 (1982).[1] The essence of a § 1 claim is concerted action. *Schwimmer v. Sony Corp. of America,* 677 F.2d 946, 952 (2d Cir.), *cert. denied,* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). An agreement between a manufacturer and its distributors to control resale prices of the manufacturer's products (vertical resale price maintenance) is per se illegal under § 1 of the Sherman Act. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 404–09, 31 S.Ct. 376, 383–85, 55 L.Ed. 502 (1911). By way of contrast, "[a] manufacturer ... has a right to deal, or refuse to deal, with whomever it likes,

as long as it does so independently.... [T]he manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply." (*Monsanto, supra,* 465 U.S. at 761, 104 S.Ct. at 1469 relying on *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). An essential element of an antitrust claim, therefore, is evidence of a combination.

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The dispute must involve a material fact, one which affects the outcome of the suit under the governing substantive law. *Id.* Moreover, the dispute must be genuine, one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

■ The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. "This may consist simply of pointing out that the plaintiff has failed to present any evidence to establish a necessary element of the cause of action." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). It then is incumbent upon the nonmoving party to show more than a "metaphysical doubt" as to the existence of material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct.

---

1. The Connecticut Antitrust Act, Conn.Gen.Stat. §§ 35–24 *et seq.,* incorporates, in modified form, the Sherman Antitrust Act. *Shea v. First Federal Savings & Loan Ass'n. of New Haven,* 184 Conn. 285, 303–04, 439 A.2d 997 (1981). Although not dispositive, interpretations of the federal act nevertheless are persuasive in construing the state act. *Elida Inc. v. Harmor Real-*

*ty Corp.,* 177 Conn. 218, 226, 413 A.2d 1226 (1979). The parties concur that the plaintiff has no independent antitrust claim by virtue of the state act, as a determination under the federal act will control. Motion for Summary Judgment at 10–11; Opposition Memorandum at 19 n. 1.

1348, 1356, 89 L.Ed.2d 538 (1986). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *W.A. Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

> But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray–Rite Corp.*, 465 U.S. 752 [104 S.Ct. 1464, 79 L.Ed.2d 775] (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently.

*Matsushita, supra,* 475 U.S. at 588, 106 S.Ct. at 1357 (citations omitted).

### 1. Coercion

■ As the court understands the plaintiff's argument, he claims that he was coerced by Hartmann Luggage into offering his merchandise at a higher price, within an acceptable range of Hartmann's suggested retail prices. This combination, the plaintiff asserts, violates § 1 of the Sherman Act. The court concurs with the legal theory. *See Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52–53

(2d Cir.1980). In the instant action, however, plaintiff's theory lacks factual support.[2]

The thrust of plaintiff's argument is that, based on a threat of termination allegedly implicit in a pricing discussion held with defendant's regional vice president, Sorisio agreed to mark his Hartmann merchandise with a discount of twenty percent or less, rather than his customary thirty percent discount. He nevertheless adhered to the thirty percent discount policy, and he claims that in retaliation Hartmann Luggage refused to sell him its new line of luggage and denied him access to a sales representative.

In *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Court held that,

> an unlawful combination is not just such as arises from a price maintenance *agreement,* express or implied; such a combination is also organized if the producer secures adherence to his suggested retail prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.

*Id.* at 43, 80 S.Ct. at 511. Sorisio claims that such an unlawful combination occurred when he unwillingly complied with Hartmann's suggested prices. *See Yentsch, supra,* 630 F.2d at 52. Yet, the United States Supreme Court has held that "a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Monsanto, supra,* 465 U.S. at 761, 104 S.Ct. at 1469. The issue, therefore, is whether the plaintiff can offer evidence that his agreement was coerced. Mere reluctance to adhere to suggested

---

**2.** Defendant argues that plaintiff's theory of unlawful combination between Connecticut Handbag and Hartmann Luggage is inappropriate because it was not pleaded in the complaint. Reply Memorandum at 4. Hartmann seeks to impose a factual pleading requirement that is not mandated by the Federal Rules of Civil Procedure. Plaintiff alleges that Hartmann's refusal to deal was a product of "agreement and combination with other Hartmann luggage dealers in the State of Connecticut." Complaint ¶ 26. The court construes this allegation to sub-

sume an agreement or combination with Connecticut Handbag. *See* 2A J. Moore, *Moore's Federal Practice* ¶ 8.17[3], at 8–104 (2d ed.1985) ("the law is now well-settled that antitrust pleading is governed by the generally liberal philosophy of Rule 8."); *id.* at 8–113 ("there are certain acts, such as price fixing ... that are presumptively deemed to violate the antitrust laws. Where such per se violation is charged, with resultant harm to the plaintiff alleged, the pleading suffices.").

retail prices, absent coercion, will not suffice.

While evidence of exposition, persuasion, argument, or pressure alone is insufficient to establish coercion, threats of termination, as long as they secure adherence to the fixed price, have been deemed to trespass beyond the boundaries ... thereby triggering a finding of illegal combination.

*Yentsch, supra,* 630 F.2d at 53. *See also Bowen v. New York News, Inc.,* 522 F.2d 1242, 1254 (2d Cir.1975) (manufacturer's threat of termination for noncompliance with resale prices constitutes active coercion, "whether made in combination with others or alone"), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). "For [Sorisio] to avoid summary judgment on [his] price-fixing claim [he] must advance sufficient evidence to raise a genuine dispute as to whether defendant[ ] engaged in coercive activity to force adherence to its suggested retail price and plaintiff and other retailers actually adhered to that price." *Reborn Enterprises, Inc. v. Fine Child, Inc.,* 590 F.Supp. 1423, 1439 (S.D.N.Y. 1984), *aff'd,* 754 F.2d 1072 (2d Cir.1985).

As an initial matter, plaintiff offers no evidence, other than his own claim, that the discounting policy at Connecticut Handbag differed markedly from that of other Hartmann retailers. According to plaintiff, his discount rate of thirty percent exceeded the rates of twenty percent or less used by other Hartmann dealers. Opposition Memorandum at 28–29; Sorisio Dep. at 52. Plaintiff presented no permanent records to prove that he charged a thirty percent discounted price. Sorisio Dep. at 58–59. Sorisio claimed knowledge of others' pricing practices through prior work experience, a visit to another retailer's store, reading advertisements, and talks with sales representatives. *Id.* at 35–39. Plaintiff offers no documentary or testamentary evidence on this issue. Testimony from the defendant suggested that discount practices were not unusual among Hartmann dealers.[3] Sorisio conceded, in response to an inquiry regarding the regular discount practices of other Hartmann dealers in 1983 and 1984, that such dealers discounted "to some degrees when necessary." *Id.* at 130.

Plaintiff contends that in April, 1983, during a meeting in his Bridgeport store with Bruce Kalish, defendant's regional vice president, and James Imwalle, Sorisio's Hartmann sales representative, Kalish allegedly stated that other distributors were complaining about the prices in plaintiff's Norwalk store, and that the plaintiff's competitors were "living with twenty percent off, that people are happy." Sorisio Dep. at 54–55. When Sorisio offered to change his prices, Kalish allegedly responded, "I could live with it an awful lot better." *Id.* Imwalle said nothing. *Id.* at 72. Plaintiff agreed to mark his Hartmann merchandise at twenty percent off. Plaintiff did not elicit any corroborative testimony about this conversation from Mr. Kalish or Imwalle during their depositions. *See* Kalish Dep. at 13–19; Imwalle Dep. at 14. Neither person denied that the comments were made, because neither was asked about them.[4] Their testimony merely confirmed that the meeting occurred. Kalish acknowledged that dealer complaints were typical, but that he recalled no specific

---

3. Sorisio concedes that he was informed by Irwin Davidson, a regional vice president for Hartmann Luggage, that "a lot of people discount. It just becomes a matter of degrees." Sorisio Dep. at 35; Opposition Memorandum at 28. Certainly other retailers discounted. Bruce Kalish, a regional vice president for Hartmann, indicated that "most of the stores we sold discounted.... Not everybody kept full suggested retail." Kalish Dep. at 31. Moreover, Jim Imwalle, a Hartmann sales representative for Sorisio, testified in response to an inquiry seeking "knowledge as to how [Sorisio's] retail prices of Hartmann products compared to other accounts of yours in the State of Connecticut", that "They were all similar." Imwalle Dep. at 24.

4. The defendant elicited no testimony on this issue when cross examining these two individuals at their depositions. Both depositions antedate that of the plaintiff. Imwalle Dep. 11/12/85; Kalish Dep. 1/21/86; Sorisio Dep. 7/21/86. The first indication that plaintiff's action would be based, in part, on a theory of combination between defendant and Connecticut Handbag resulting from a coercive threat allegedly made by defendant, was the Opposition Memorandum, filed on December 1, 1987.

complaints about Connecticut Handbag. Kalish Dep. at 30, 32.

Sorisio claims that this conversation constituted an implied threat. In his brief, he claims that he complied to ensure approval as a franchisee. Opposition Memorandum at 29–30. In his affidavit, plaintiff claims that he changed the sales tickets to prevent termination of the franchise. Sorisio Affidavit ¶ 7. The court will assume for purposes of deciding this motion that Kalish made such comments. Sorisio's claim that he felt threatened is undermined by his own deposition testimony. In a response indicating acquiescence, not coercion, Sorisio stated that, "I was essentially doing Mr. Kalish a favor. I was making his life more livable. The spirit of cooperation." Sorisio Dep. at 68. *Cf. Monsanto, supra,* 465 U.S. at 761, 104 S.Ct. at 1469 (mere acquiescence is not actionable). Plaintiff claims that he changed his price tags in Norwalk to show a twenty percent discount, but he also claims that he told Kalish, " 'We'll leave Bridgeport alone and if you live more comfortably, Bruce, great, I'm still going to effectively sell it at what I want to.' " *Id.* at 56. Sorisio testified that he interpreted Kalish's concern as one with the marked price, so he showed a twenty percent discount but gave purchasers additional discounts. *Id.* Sorisio Affidavit ¶ 7. Plaintiff makes no claim that he ever actually sold his Hartmann merchandise at other than his conventional discount levels.

■ The court concludes that plaintiff has not created a genuine dispute as to the material facts supporting his coercion claim. There is no showing that plaintiff's discounting policy differed markedly from that of his competitors. Nor has the plaintiff offered any evidence of the defendant's purported threats at the April, 1983, meeting, other than his own recollection. Even if this discussion occurred as recounted by Sorisio, this court holds as a matter of law that such is insufficient to constitute "evidence of threats or other *explicitly* coercive conduct" required to establish coercion. *Belfiore v. New York Times Co.,* 654

F.Supp. 842, 851 (D.Conn.1986) (emphasis added), *aff'd,* 826 F.2d 177 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988). Plaintiff's own deposition testimony seriously undermines his claim that he perceived Kalish's comments as threatening. Pricing persuasion, pressure, even argument, is permissible conduct. *See Yentsch, supra,* 630 F.2d at 53. Nor has the plaintiff demonstrated that he complied by actually charging higher prices. Such actual adherence is required as a matter of law. *See id.* at 54–55; *Belfiore, supra,* 654 F.Supp. at 852; *Reborn Enterprises, Inc., supra,* 590 F.Supp. at 1439.

■ Sorisio also argues that Hartmann's selective refusal to deal its new line of luggage, and its denial of a sales representative constitute additional coercion. Opposition Memorandum at 34. Sorisio claims that Imwalle informed him of Hartmann's refusal to deal with Connecticut Handbag on the new Hartmann lines at a June, 1983, meeting. Imwalle purportedly said,

> "I don't know how to tell you this, but there's a hit list out from Hartmann, and," he said, "certain people are on it and I believe you are on it, that you will not be eligible to receive this new merchandise."

Sorisio Dep. at 76–77. Sorisio further claims that Imwalle said that the reason was Sorisio's pricing policies. *Id.* at 77–78. Imwalle agreed that he informed Sorisio of Hartmann's decision. Imwalle Dep. at 29. His version of the reasoning is different. He remembered discussing it with Kalish, but didn't think that Kalish ever gave him a specific reason. *Id.* at 30.[5] Imwalle also testified that this was not Kalish's decision to make, but was a "Headquarters" determination. *Id.* Plaintiff claims that he eventually telephoned Kalish in August, 1983, to request the new product line. Sorisio Dep. at 84. Kalish purportedly confirmed that Connecticut Handbag would not receive the new line, refused to discuss it, and stated, "Effectively, we're going to be sold out for the year on it. We have

5. Kalish does not remember this conversation with Imwalle, Kalish Dep. at 20–21.

committed." *Id.* at 85. Sorisio does not allege that price was discussed. He had no further discussions with Hartmann representatives regarding the new line. *Id.* at 89–91.

The court concludes that plaintiff has not established a factual predicate upon which a jury could conclude that Hartmann's refusal to sell Sorisio its new line of luggage was a price-related attempt to coerce the plaintiff into raising his prices. The plaintiff has failed to establish that any threats, express or implied, antedated or accompanied Hartmann's conduct. Moreover, plaintiff adduced no evidence, other than his own deposition testimony, to suggest that this episode was related to his pricing policies.

■ Plaintiff's claim of failure to provide a sales representative equally is unavailing. Imwalle left Hartmann's employ in July, 1983. Imwalle Dep. at 31. The plaintiff claims that during his phone call with Kalish in August, 1983, he inquired about a replacement. Sorisio Dep. at 85. Kalish allegedly stated that he would provide a sales representative "possibly in '84," but that Barry Kaspar, Imwalle's replacement, would not be calling at Connecticut Handbag. Kalish does not recall this conversation. Kalish Dep. at 29–30. Barry Kaspar, Imwalle's replacement, testified in his deposition that Kalish instructed him not to call on Connecticut Handbag, and that the reason was image related. Kaspar Dep. at 16. Other than to conclude that the lack of a sales representative was a coercive measure on Hartmann's part, Sorisio does not allege that he had any conversation with anyone that suggested that Hartmann's motivation was price related. The lack of a sales representative did not prevent Sorisio from ordering and obtaining Hartmann's other products. Opposition Memorandum at 16; Kaspar Dep. at 17; Bienstock Dep. at 45.[6] Moreover, Janet Bienstock, the sales representative who replaced Kaspar in February, 1984, testified that she attempted, in early 1984,

to "introduce [her]self and offer [her] services as their new sales representative." Bienstock Dep. at 4, 25. She was unable to locate Connecticut Handbag's Brookfield, Connecticut, office location, and she claims that follow-up phone calls to Sorisio were unsuccessful. *Id.* at 26–27. In deposition testimony, Sorisio referred to Bienstock's call of March 27, 1984, at 2:13 P.M. Sorisio Dep. at 104, 107. This suggests a gap in sales coverage, not a failure to provide a sales representative. Bienstock testified that she did visit Sorisio's retail locations in March or April, 1984, but that this visit was in conjunction with Hartmann's nationwide image review of its retailers. Bienstock Dep. at 27–28. Whether viewed individually, or in conjunction with Kalish's purported price-related threat, Hartmann's failure to provide Sorisio with a sales representative is insufficient to establish coercion.

### 2. Complaints

■ The plaintiff's theory is that Hartmann Luggage terminated Sorisio in response to complaints lodged by competitors, thus serving to fix prices at levels higher than those charged by Connecticut Handbag. Opposition Memorandum at 14. Sorisio further claims that Hartmann's image-related reasons for the termination of his dealership were pretextual. *Id.* at 17. The requisite combination alleged is not between Hartmann and the plaintiff, but between Hartmann and plaintiff's competitors.

Plaintiff must offer "evidence which tends to exclude the possibility that the manufacturer and the nonterminated distributors were acting independently." *Monsanto,* supra, 465 U.S. at 764, 104 S.Ct. at 1470. "Something more than evidence of complaints is needed." *Id.* The Second Circuit has provided guidelines that indicate what will be considered insufficient as a matter of law to warrant an inference of a conspiracy or combination.

"[A] mere showing of close relations or frequent meetings between the alleged

**6.** The page numbers on the copy of Bienstock's deposition are not clear. The court's citations are approximate.

conspirators ... will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement." Nor does a manufacturer's mere receipt of complaints from its wholesalers or agents who compete with the plaintiff, or its consultation with such other competing wholesalers, standing alone, support a finding of conspiracy with them. Even where a termination follows the receipt of complaints from wholesalers or agents, there is no basis for inferring the existence of concerted action, absent some other evidence of a tacit understanding or agreement with them.

*H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981) (citations omitted), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

Plaintiff has established some evidence of complaints. Sorisio's knowledge of these complaints comes from Imwalle's deposition testimony. Sorisio Dep. at 142. Imwalle recounted receiving inquiries from three specific area dealers, Imwalle Dep. at 25–28, two of whose complaints addressed concerns with Connecticut Handbag. *Id.* at 25.[7] Imwalle claimed that no discussions ensued with either dealer, as he responded to these inquiries with "I am not allowed to discuss the pricing policies of my dealers to you or anybody else." *Id.* at 26, 27. Kaspar recalled complaints from other dealers but, like Imwalle, he refused to discuss Connecticut Handbag with his accounts. Kaspar Dep. at 24. Bienstock testified that Sorisio's stores were mentioned to her by her other accounts, but that she never discussed Connecticut Handbag with them. Bienstock Dep. at 37. She further stated that none of these accounts threatened to cease carrying Hartmann products if it continued to deal with Sorisio. *Id.* at 51–52.

No evidence suggests that Imwalle, Kaspar, or Bienstock communicated these complaints to Sorisio.

The Second Circuit has noted that "[i]n a case where the alleged scheme is short-term and relatively simple in operation, we must as a practical matter accept that the best proof available most often will only tend to show the existence of an informal, perhaps even tacit, rather than explicit, agreement." *Apex Oil Co., supra*, 822 F.2d at 253. Plaintiff's proof does not rise to an inference of an informal or tacit agreement. Although evidence exists documenting general discussions of Hartmann's marketing policies, no evidence suggests that Sorisio's price cutting served as the basis for competitors' complaints. Indeed, the evidence consistently suggests that defendant's personnel refused to entertain any complaints addressed specifically to Connecticut Handbag. Moreover, the only evidence as to whether Sorisio's competitors threatened to stop buying from Hartmann if it allowed continued discounting at Connecticut Handbag indicates that no such threats were made. Bienstock Dep. at 51–52. *Cf. Burlington Coat Factory Warehouse v. Belk Bros. Co.*, 621 F.Supp. 224, 235 (S.D.N.Y.1985); *Reborn, supra*, 590 F.Supp. at 1433.

Sorisio argues that evidence of his own coercion should serve to suggest inferentially that other dealers similarly were coerced. As the court did not find sufficient evidence of plaintiff's coerced compliance with defendant's suggested retail prices, this argument is unavailing. Nor has the plaintiff established any actual adherence to Hartmann's alleged price-fixing policy, either by Connecticut Handbag or its competitors. Absent evidence of some agreement, actual compliance is crucial to an inference of a combination. *See*

---

7. One of the dealers, Jack Erlich, indicated in deposition testimony that he didn't recall any discussions where he lodged formal complaints with Imwalle. Erlich Dep. at 15. He recalls speaking to a Hartmann salesperson after finding out what type of store Sorisio operated "and to find good merchandise in that type of a store...." *Id.* at 12. No testimony was elicited suggesting that this dealer complained about prices. Another dealer, Steve Silver, testified

that he recalled several discussions with various Hartmann sales representatives, but only one that definitely involved Connecticut Handbag. This was in a December, 1983, discussion with Kaspar, when Kaspar volunteered that Hartmann was selling merchandise to Sorisio but was looking to try to close the account. Silver Dep. at 5–6. Silver disavowed any discussions of Sorisio's discounting policies with Hartmann, *id.* at 7, or other retailers, *id.* at 11.

*Yentsch, supra,* 630 F.2d at 54; *Belfiore, supra,* 654 F.Supp. at 852; *Reborn, supra,* 590 F.Supp. at 1439.

Plaintiff would have the fact finder infer the existence of a combination by virtue of his attack on the image-related business reasons proffered by Hartmann for its termination of Sorisio. Opposition Memorandum at 17. As a general proposition,

> [t]he mere fact that a business reason advanced by a defendant for its cut-off of a customer is undermined does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy. Even if a manufacturer or supplier, acting independently, gave a false or inaccurate reason for its action, whether because of a desire to avoid controversy or some other consideration, this would not violate any legal obligation to the customer, absent proof of a conspiracy or breach of contract.

*H.L. Moore Drug Exchange, supra,* 662 F.2d at 941. The Second Circuit discussed the relevance of failure to follow internal procedures governing termination in *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919 (2d Cir.1985). In that case, the court did not allow the defendant's failure to adhere to its internal termination procedures to serve as evidence of concerted action. The court compared *Burlington* to *Monsanto,* noting that, in both cases, marketing requirements were not disclosed to a dealer prior to termination but these standards assumed import only after litigation was commenced. 769 F.2d at 924. In *Burlington,* the record contained uncontroverted evidence that such a policy existed, but the record was devoid of any evidence of complaints by competing dealers. *Id.* *Monsanto,* according to the court, did "involve an issue as to the honesty of the claim that the cancellation was based on retail marketing requirements." *Id.* Moreover, evidence of complaints by competing dealers existed in that case. *Id.*

Although the instant action appears, at first blush, to fit within the *Monsanto* mold, a significant issue distinguishes these two cases. In *Monsanto,* the Court found "substantial *direct* evidence of agreements to maintain prices" between Monsanto and its distributors. 465 U.S. at 765, 104 S.Ct. at 1471. Indirect evidence in the form of a newsletter produced by one of the distributors also implied the existence of such an agreement. *Id.* at 765–66, 104 S.Ct. at 1471–72. With this agreement as a backdrop, the Court then determined that a jury issue existed as to whether Spray–Rite's termination was pursuant to the agreement. *Id.* at 767, 104 S.Ct. at 1472. The record included testimony that Monsanto representatives informed Spray–Rite of complaints from other distributors. *Id.* Monsanto expressly requested that Spray–Rite comply with its resale prices, and then explicitly threatened termination if it did not raise its prices. *Id.* at 767–78, 104 S.Ct. at 1472–73.

In the instant action, plaintiff adduced no direct evidence of an agreement between Hartmann and its distributors to maintain prices. The court determined that plaintiff's circumstantial evidence on this same question is insufficient as a matter of law. "[T]here must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto, supra,* 465 U.S. at 768, 104 S.Ct. at 1473. Absent evidence of any such "conscious commitment" in the instant action, the court will not consider the merits of plaintiff's challenge to the veracity of Hartmann's reasons for terminating the plaintiff's dealership.

Accordingly, the defendant is granted summary judgment on the federal and state antitrust claims.

### B. *Count Two—Connecticut Franchise Act Claim*

In Count Two of his complaint, Sorisio alleges that Hartmann's termination of its relationship with Connecticut Handbag constituted a violation of the Connecticut Franchise Act ["Act"]. Conn.Gen.Stat. §§ 42–133e *et seq.* A franchise relationship, as defined by the Act, may not be terminated except upon good cause shown and upon

sixty days written notice. Conn.Gen.Stat. § 42–133f(a).

> "Franchise" means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor ... *and* (2) the operation of the franchisee's business pursuant to such a plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate....

Conn.Gen.Stat. § 42–133e(b) (emphasis added).

Defendant argues that the Act is inapplicable to the instant action because the relationship between Hartmann and Connecticut Handbag was not that of a franchise. Hartmann contends that it did not prescribe, in substantial part, a marketing plan for Sorisio and that plaintiff's business was not substantially associated with its trade name. The court concurs.

■ Sorisio has failed to establish that he operated under a "marketing plan or system prescribed in substantial part" by Hartmann. In *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Sup. 495, 452 A.2d 123 (App.Sess.1982), the court enumerated several factors that are relevant to this determination. These include control over hours and days of operation, advertising, financial support, auditing of books and inspection of premises, control over lighting, employee uniforms, prices, trading stamps and hiring, sales quotas, and management training. *Id.* at 498–99, 452 A.2d 123. There is no precise formula as to how many of such factors must exist, in the aggregate, before the control exercised by a manufacturer rises to a marketing plan or system prescribed in substantial part by a franchisor. Nevertheless, plaintiff has established very few such factors in the instant case.

■ The record is devoid of evidence that Hartmann prescribed operations, uniforms, hiring or sales quotas, or that it audited books or provided financing. The "image criteria" used by Hartmann to establish standards for its retailers is not a prescription. It is strictly an internal document, unavailable to the retailers, and contains merely general standards, not specific plans or systems. Motion for Summary Judgment at 31; Defendant's Exhibit O (Subject to Protective Order). The evidence of inspections (one when Hartmann first considered Connecticut Handbag in early 1982, and one when it performed a nationwide review in 1984) is de minimis. Instructions on product promotion, display and training, both of which were geared toward intrastore product differentiation, do not constitute indicia of control. *Grand Light & Supply Co., Inc. v. Honeywell, Inc.,* 771 F.2d 672, 677 (2d Cir.1985); *McKeown Distributors, Inc. v. Gyp–Crete Corp.,* 618 F.Supp. 632, 642 (D.Conn.1985). No evidence exists that Hartmann prescribed prices. It suggested retail prices, and discounting practices were prevalent. *See supra.* Plaintiff's argument, therefore, rests squarely on the fact that Sorisio received and executed a "franchise agreement", and that Hartmann required Sorisio to stock its full line of luggage before he could be approved as a dealer. Opposition Memorandum at 43–45.

The court concurs with the plaintiff that the use of the word "franchise" in an agreement between a manufacturer and a dealer may be a probative factor. *Id.* at 45. *Cf. McKeown Distributors, Inc., supra,* 618 F.Supp. at 642–43 (absence of the term "franchise" in agreement is relevant to determination of franchise under the Act). Sorisio's initial inquiry to Hartmann was directed at acquiring a franchise, and the response acknowledged plaintiff's "interest in becoming a Hartmann franchised dealer." Plaintiff's Exhibits 2, 5. Plaintiff also relies on Hartmann's "Acknowledgement of Authorized Franchised Dealer Policy" form, which requires that a signatory dealer agree to adhere to Hartmann's policy, as stated in its "Notice to Dealers." *Id.* Exhibit 9. Sorisio and Imwalle executed

such a form, but it is undated.[8] Hartmann claims that they have no record of receiving this executed form. A dispute exists, therefore, about whether Sorisio was an authorized dealer commencing some time in early 1983. *See* Imwalle Dep. at 17; Kalish Dep. at 25. *Cf.* McCornack Dep. at 9–10 (Sorisio was a dealer for close-out merchandise only and the shipment of general goods to Connecticut Handbag was an error).

This status, authorized dealer, is not necessarily synonymous with "franchisee" as that term is used in the Act. The policy that Sorisio agreed to requires that the authorized dealer (1) sell only to retail customers, (2) only in the location initially approved by Hartmann, and (3) obtain permission from Hartmann prior to expanding the franchise to additional locations. Plaintiff's Exhibit 9. In addition, the policy contains a prohibition against transshipping. Violation of the policy is grounds for termination as a dealer. The dealer's signature is required as an acknowledgement of this policy. *Id.* Coupled with the policy is the requirement that a dealer must buy and present all of Hartmann's lines. These are prescriptive measures, but together they do not approach the level of *operational* control required under the Act. *See, e.g., Carlos v. Philips Business Systems, Inc.*, 556 F.Supp. 769, 776 (E.D.N.Y.) (construing Connecticut Act, evidence of defendant's "overwhelming" control over plaintiff's business established franchise relationship), *aff'd*, 742 F.2d 1432 (2d Cir. 1983).

■ Even if a marketing plan was substantially prescribed by Hartmann, the court holds that Sorisio's stores were not "substantially associated with [Hartmann's] trademark ... [or] trade name...." Conn.Gen.Stat. § 42–133e(b)(2). Plaintiff contends that there is no exclusivity provision in the Act, requiring a franchisee to carry only a franchisor's merchandise. At least two federal district courts noted this also, and held that only the portion of the business operated pursuant to a marketing plan or system needed to be "substantially associated" with the franchisor's trademark. *See Hydro Air of Connecticut, Inc. v. Versa Technologies, Inc.*, 599 F.Supp. 1119, 1125 (D.Conn.1984); *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, Civ. No. N78–342 (D.Conn. July 13, 1984), *rev'd*, 771 F.2d 672 (2d Cir.1985).

The Second Circuit explicitly overruled this interpretation in *Grand Light, supra.* The court interpreted dicta in *Muha v. United Oil Co.*, 180 Conn. 720, 726, 433 A.2d 1009 (1980), the only Connecticut Supreme Court opinion construing the Act, to mean that "the absence of exclusivity in the lessor/lessee relationship would have been significant, even if there had been a trademark." 771 F.2d at 678. In *Grand Light*, the Second Circuit stated that exclusivity is not required under the Act, but that "more than three percent be involved," which was the amount of Grand Light's business attributable to Honeywell. *Id.* The policy issue, as defined by the court, required much more.

> Where the franchisee is completely dependent on the public's confidence in the franchised product for *most or all his business*, abrupt severance of the franchise tie, without good cause and without sufficient notice, could spell ruination. No such dependence existed here.

*Id.* at 677 (emphasis added).

Similarly, no such dependence is demonstrated in the instant action. Sorisio concededly carries many lines of luggage, "more than any department store in the State." Sorisio Dep. at 17. Defendant argues, and plaintiff does not contest, that Sorisio's purchases of Hartmann merchandise constituted less than ten percent of his total product purchases in 1982, 1983, and 1984. Motion for Summary Judgment at 36 & n. 7. He argues that, had he been able to purchase Hartmann's new lines in 1983 and 1984, a larger percentage of his

---

**8.** Accompanying the form is a hand-written note, which purports to be from Imwalle and that instructs Sorisio to sign the form but not to date it. Imwalle's note is dated 4/23/83, although he could not recall when he signed the document. Imwalle Dep. at 67–68. Sorisio testified that he received Imwalle's dated note with the policy form. Sorisio Dep. at 110.

business would have been devoted to Hartmann's products. Opposition Memorandum at 46–47. Plaintiff's argument transcends reasonable inference into the clearly speculative. Neither the record nor the plaintiff suggests, nor will the court infer, that Hartmann merchandise would have comprised "most if not all of [Sorisio's] business."

Absent a marketing plan or system prescribed by defendant and a substantial association with Hartmann's trademark or trade name, the court concludes that the Connecticut Franchise Act is inapplicable to this action. Defendant's motion for summary judgment on Count Two is granted.

### C. Count Three—Connecticut Unfair Trade Practices Claim

■■■■ The Connecticut Unfair Trade Practices Act ["CUTPA"] provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn.Gen.Stat. § 42–110b(a). Plaintiff's complaint contains three allegations of CUTPA violations. Sorisio claims that the conduct underlying his antitrust claim also violates the CUTPA. Complaint ¶ 29.[9] In his brief, Sorisio argues that even if summary judgment is granted on the antitrust claims, a jury might find defendant's "refusal to deal" or termination were an unfair practice. Opposition Memorandum at 49–51. Plaintiff argues that Hartmann did much more than merely refuse to deal; it purportedly "refus[ed] to sell plaintiff the new Hartmann luggage lines, den[ied] him the service of a sales representative, and then terminat[ed] plaintiff as a Hartmann franchise dealer in order to reduce or eliminate price competition in Connecticut." Id. at 51.

An allegation of conspiracy or combination is not required in order to state a claim under the CUTPA, but evidence establishing a nexus between Hartmann's conduct prior to June 8, 1984, and the public interest is required. Ivey, Barnum & O'Mara

v. Indian Harbor Properties, Inc., 190 Conn. 528, 540, 461 A.2d 1369 (1983), as superseded by Public Act 84–468 § 2 (June 8, 1984) ("Proof of public interest shall not be required in any action brought under [CUTPA]."). The amendment has not been given retroactive application. L. Cohen & Co. v. Dun & Bradstreet, Inc., 629 F.Supp. 1425, 1432 (D.Conn.1986) (and cases cited therein).

Plaintiff alleges and the court discerns no "specific and substantial" public interest inherent in Hartmann's decisions to forego sales of its new lines of luggage to Connecticut Handbag and to allow an eight-month gap in sales representative coverage. Hartmann's decision to terminate Sorisio as a dealer occurred after June 8, 1984 and, need not be cloaked in the mantle of public interest. Plaintiff must only allege that this conduct was unfair, as defined by the CUTPA. Connecticut's Supreme Court defines unfairness as

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businessmen).

Ivey, Barnum & O'Mara, supra, 190 Conn. at 539 n. 13, 461 A.2d 1369 (citation omitted).

A CUTPA claim must be pleaded with particularity to allow evaluation of the legal theory upon which the claim lies. See Grand Light, supra, Civ. No. N78–342 (D.Conn. April 23, 1987), aff'd, 838 F.2d 1202 (2d Cir.1987) (oral opinion per local rule 0.23). A practice may be unfair even if all three criteria are not met. McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 569, 473 A.2d 1185 (1984); Gibbs v. Mase, 11 Conn.App. 289, 296, 526 A.2d 7

---

9. Plaintiff also maintains that his termination as a franchisee without a good cause or written notice violates the CUTPA. The court held that the Connecticut Franchise Act is inapplicable to this action, thus rendering plaintiff's second CUTPA claim moot.

(1987). Plaintiff alleges that the defendant's conduct was "immoral, unethical, oppressive or unscrupulous." This second criterion is "largely duplicative" of the other two factors. *Carpentino v. Transport Ins. Co.*, 609 F.Supp. 556, 563 (D.Conn. 1985) (citation omitted).

Sorisio argues that, to the extent that defendant's conduct violates antitrust law, it violates public policy, thus serving as grounds for a CUTPA claim. Opposition Memorandum at 49. Because the court determined that no such violation occurred, this argument is unavailing. Plaintiff concedes that a "simple refusal to deal" is within the defendant's rights. *Id.* at 50–51. He argues, however, that a refusal to deal complicated by additional conduct may offend public policy, specifically as a violation of the Federal Trade Commission Act. *Id.* at 51. Defendant acknowledges that its conduct may be "actionably 'unfair' under CUTPA even if not actually violative of the antitrust laws...." Motion for Summary Judgment at 40 n. 10. Plaintiff's position fails, however, because the additional conduct he relies on was dismissed by the court for occurring prior to June 8, 1984, and for lacking public interest. Plaintiff's remaining claim is that Hartmann "terminat[ed] plaintiff as a Hartmann franchise dealer in order to reduce or eliminate price competition in Connecticut." Opposition Memorandum at 51. Sorisio was not a franchise dealer when he was terminated. He may or may not have been an authorized dealer. Even assuming that he was authorized as a dealer, plaintiff offers no basis to conclude that Sorisio's termination violates the Federal Trade Commission Act or any other statute, common law, or "established concept of fairness." He does not suggest that Hartmann violated its dealership agreement, or that its conduct constituted unfair competition. *Cf. Copy–Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405, 411 (2d Cir.1981), *on remand* 582 F.Supp. 231 (S.D.N.Y.1984),

*rev'd* 755 F.2d 293 (2d Cir.), *cert. denied*, 474 U.S. 825, 106 S.Ct. 80, 88 L.Ed.2d 66 (1985). He argues instead that Hartmann's stated image-related rationale for the termination was pretextual, and that its true goal was price fixing. As held earlier, evidence of price fixing has not been established in either the plaintiff's complaint or his brief. The court is unwilling to open this inquiry to a jury absent a particularized allegation of how the termination constituted a violation of an established concept of unfairness.[10] Summary Judgment is appropriate.

Sorisio also alleges that, even if the Connecticut Franchise Act does not govern this action, when Hartmann informed him that he was a franchisee it required him to comply with the defendant's "Authorized Dealer Franchise Policy," a deceptive practice that plaintiff claims violated the CUTPA. As stated earlier, the alleged deception and Sorisio's "coerced compliance" with the dealer's policy occurred prior to June 8, 1984. Again, plaintiff alleges no nexus with a "specific and substantial" public interest. Public policy with regard to franchise relationships was codified during this period of time in the Connecticut Franchise Act, which the court held, *supra*, does not govern the parties' relationship.

In his brief, Sorisio argues that "[t]he implication of such representation was that plaintiff was protected by this state's franchise statute." Opposition Memorandum at 52. He argues that this cause of action arose in July, 1984, when he was terminated by Hartmann. The court disagrees. The defendant's use of the term "franchise" in correspondence and in the "Authorized Dealer Franchise Policy" form became "deceptive" only when the court held the Connecticut Franchise Act inapplicable to the parties' relationship. Plaintiff has no more claim to CUTPA damages on this theory than would Hartmann, should it pursue vexatious litigation dam-

---

**10.** Plaintiff neither alleges in his complaint nor pleads in his brief that defendant's conduct caused substantial injury to consumers, competitors, or other business people. *See Ivey, Barnum & O'Mara, supra*, 190 Conn. at 539 n. 13, 461 A.2d 1369. *See also McLaughlin Ford, supra*, 192 Conn. at 569–70, 473 A.2d 1185 (to succeed on this third criterion, plaintiff must satisfy three-pronged "substantial injury test").

ages. Reasonable arguments existed on the franchise question. The court will not allow plaintiff to bootstrap his way into a claim of deceptive representation based on a judicial determination rendered after three years of active discovery and thorough briefs submitted by both parties. This theory of CUTPA fails, and summary judgment for the defendant is appropriate.

### CONCLUSION

Summary Judgment is granted on Counts One, Two and Three of the complaint.

SO ORDERED.