**JEROME–DUNCAN, INC.,**
Plaintiff–Appellant,

v.

**AUTO–BY–TEL, L.L.C.,** Auto–By–Tel Marketing Corporation, and North Brothers Ford, Inc., Defendants–Appellees.

No. 98–1123.

United States Court of Appeals,
Sixth Circuit.

Argued April 21, 1999.

Decided May 21, 1999.

John A. Libby (argued and briefed), Sharon M. Woods, Thomas F. Cavalier, Barris, Sott, Denn & Driker, Detroit, MI, for Plaintiff–Appellant.

Thomas J. Tallerico (argued and briefed), Jeffrey G. Raphelson (briefed), Bodman, Longley & Dahling, Detroit, MI, Patrick M. McCarthy, Howard & Howard, Bloomfield Hills, MI, John C. Polasky, Troy, MI, for Defendants–Appellees.

Before: KEITH, SUHRHEINRICH, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Jerome–Duncan, Inc. ("JDI"), a Ford dealership in Michigan, sued Auto–By–Tel Marketing Corporation ("ABT"), a Delaware corporation that refers potential car buyers to dealerships through its internet web site, for breach of contract in the Circuit Court of Macomb County, Michigan. It also sought a declaratory judgment that the contract was a franchise agreement covered by the Michigan Franchise Investment Law. JDI subsequently filed an amended complaint that added North Brothers Ford, Inc., a Michigan dealership not a party to the contract, as a defendant. The very next day, ABT filed a notice of removal to federal court based upon diversity of citizenship, not knowing that JDI had added North Brothers as an additional defendant. JDI then moved for remand to state court based upon the lack of complete diversity. Shortly thereafter, ABT moved for summary judgment on the basis that its contract with JDI was not a franchise agreement, and was therefore properly terminable without cause as set forth in the contract.

The district court denied JDI's motion for remand after concluding that North Brothers was fraudulently joined as a defendant. It also granted ABT's motion for summary judgment, finding that the Michigan Franchise Investment Law did not apply to the parties' agreement. Because we find that JDI had no cause of action against North Brothers under Michigan law, we **AFFIRM** the district court's denial of JDI's motion for remand. Furthermore, because we conclude that the contract was not a franchise agreement under the Michigan Franchise Investment Law, we **AFFIRM** the grant of summary judgment in favor of ABT.

## I.  BACKGROUND

### A.  The parties

#### 1.  Jerome–Duncan, Inc.

JDI is a Ford dealership located in Sterling Heights, Michigan. It is the eleventh largest automobile dealer in the Detroit metropolitan area, with 1995 sales of $130,600,000. In addition to selling new Ford cars and trucks, JDI also sells used vehicles, owns a body shop, and operates an automobile leasing company. According to JDI's general manager, the dealership sells more than 500 vehicles per month.

#### 2.  Auto–By–Tel Marketing Corp.

ABT is a Delaware corporation in the business of operating an internet web site that refers potential car buyers to participating dealerships. Its predecessor company, Auto–By–Tel, L.L.C., is also named as a defendant in this suit. The term "ABT" refers to the two interchangeably.

### B.  The subscription agreement

When interested car buyers access ABT's web site, they are asked to identify the model of the vehicle that they wish to purchase and the zip code where they live. ABT uses this information to connect the potential car buyer with a dealership in his or her area, but does not provide the customer with the dealership's name. Instead, it provides customer referrals to participating dealerships with whom ABT

has subscription agreements. The dealerships then contact these potential customers and quote them a price on the requested vehicle.

Participating dealerships pay a start-up fee and monthly subscription fees to ABT. In order to receive internet customer referrals from ABT, the participating dealerships must agree to display the ABT logo on print advertisements, to designate an employee to be trained by ABT, to give ABT-referred customers seven days to purchase the requested vehicle at the price quoted during the initial contact, and to conform to ABT's "Customer Service Standards."

ABT's Customer Service Standards include a phone-contact script that dealerships must use when working with customers referred by ABT. The phone procedure includes language designed to draw customers' attention to the convenience of the Auto–By–Tel buying process. For example, dealership representatives contacting customers for the first time are instructed to ask "[a]ren't you glad that you don't have to go through the old process of buying a car with all of the hassles, stress, and wasted time?" Some of the language is of the "hard-sell" variety, apparently aimed at preventing customers from using the price that they are quoted by telephone to barter with other dealerships. For example, the procedure advises the following response to a hesitant customer:

> Please be aware that our competition is **fearful** of this program because it is so successful. They will do just about anything, including quoting you an **unrealistic price**, to **lure** you into the dealership and then subject you to the same **abuse** you've probably experienced in the past. Doesn't it make more **sense** to do business with the people who **respected** you enough to give you the **real price** in the first place rather than wasting hours of your time in the hopes of saving a few more dollars?

(emphasis in original).

ABT also provides subscribing dealerships with a description of the average customer who shops for a car through the internet. The ABT guidelines advise dealerships that their internet-using customers have greater access to information than many other customers, and instruct the dealerships on how to interact with them.

Nowhere in the guidelines does ABT indicate what price a dealership should quote for the selected vehicle. ABT does not prescribe a dealership's hours of operation, product lines, or inventory practices. It does not inspect a dealership's records or financial statements.

## C. Procedural background

In June of 1996, JDI entered into a five-year subscription agreement with ABT to be the exclusive dealer to which potential Ford customers in the Michigan counties of Wayne, Oakland, Macomb, and Washtenaw would be referred. The agreement contained a clause granting either party the right to terminate on 30 days' written notice. In early 1997, ABT requested that JDI renegotiate the terms of the contract, which request JDI declined.

JDI then filed a complaint in the Macomb County Circuit Court on March 24, 1997, alleging breach of contract and seeking a declaratory judgment that the contract between JDI and ABT could not be terminated without cause because it was a franchise agreement protected by the provisions of the Michigan Franchise Investment Law. By letter dated April 22, 1997, ABT gave notice that it was terminating the contract effective May 24, 1997. On May 12, 1997, counsel for ABT telephoned counsel for JDI to advise that ABT was planning to remove the action to the United States District Court for the Eastern District of Michigan. JDI amended its state court complaint the very next day to add North Brothers, as well as to add a claim for injunctive relief and specific performance. On May 14, 1997, ABT filed its notice of removal without knowledge of the amended complaint. Five days later, JDI filed an expedited motion to remand the case back to state court based on the lack

of diversity jurisdiction. In its response, ABT alleged that North Brothers had been fraudulently joined to defeat diversity jurisdiction.

JDI then filed a motion for a preliminary injunction prohibiting ABT from terminating the contract between the parties. Finding that JDI had not demonstrated that it was likely to succeed on the merits of its claim, nor that it would suffer irreparable harm if an injunction were not granted, the district court denied JDI's motion on June 4, 1997.

On June 6, 1997, ABT filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, a motion for summary judgment under Rule 56. On December 29, 1997, the district court issued a memorandum opinion and order denying JDI's motion for remand to state court and granting ABT's motion for summary judgment. In so ruling, the district court found that North Brothers was a fraudulently joined party and that the contract between ABT and JDI was not a franchise agreement under the Michigan Franchise Investment Law. JDI timely filed its notice of appeal.

## II. ANALYSIS

### A. The district court did not err when it denied JDI's motion to remand the case to state court

#### 1. Standard of review

■ This court conducts a *de novo* review of the district court's denial of a motion to remand. *See Ahearn v. Charter Township of Bloomfield,* 100 F.3d 451, 453 (6th Cir.1996). The defendant that removes a case from state court bears the burden of establishing federal subject-matter jurisdiction. *See id.* at 453–54.

#### 2. Timing

■ The federal removal statute, codified at 28 U.S.C. § 1441, grants defendants in civil suits the right to remove cases from state courts to federal district courts when the latter would have had original jurisdiction. Diversity of citizenship, the basis for jurisdiction in the present case, exists only when no plaintiff and no defendant are citizens of the same state. *See United States Fidelity and Guar. Co. v. Thomas Solvent Co.,* 955 F.2d 1085, 1089 (6th Cir.1992). In order for a defendant to remove a case to federal court based upon diversity jurisdiction, there must be complete diversity of citizenship both at the time that the case is commenced and at the time that the notice of removal is filed. *See Easley v. Pettibone Mich. Corp.,* 990 F.2d 905, 908 (6th Cir.1993). ABT filed its notice of removal on May 14, 1997, one day after JDI had filed its amended complaint naming a non-diverse defendant (North Brothers). Therefore, if North Brothers was a proper defendant, then complete diversity did not exist when the case was removed, and the district court lacked subject matter jurisdiction.

#### 3. Fraudulent joinder

■ "When a non-diverse party has been joined as a defendant, then in the absence of a substantial federal question the removing defendant may avoid remand only by demonstrating that the non-diverse party was fraudulently joined." *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir.1992) (holding that because there was at least a colorable claim against the non-diverse defendant in state court, remand was proper). Under the doctrine of fraudulent joinder, the inquiry is whether JDI had at least a colorable cause of action against North Brothers in the Michigan state courts. *See Alexander v. Electronic Data Sys. Corp.,* 13 F.3d 940, 949 (6th Cir.1994). We thus look to Michigan law in determining whether North Brothers is a proper party, or whether it was fraudulently joined. *See id.* JDI's motive in joining North Brothers is immaterial to our determination regarding fraudulent joinder. *See Harris v. Great Lakes Steel Corp.,* 752 F.Supp. 244, 246 (E.D.Mich. 1990). The burden of proving fraudulent joinder is on ABT. *See Alexander,* 13 F.3d at 949.

As the district court noted, JDI did not seek any relief directly from North Brothers. In its original complaint, JDI named only ABT, with whom it had a contract. The amended complaint, which added North Brothers as a defendant, states that "[u]pon information and belief, Auto–By–Tel intends to enter or has entered into a contract with North Bros. whereby North Bros. will be the Ford dealer to which Auto–By–Tel accessors located in some or all of Jerome–Duncan's territory will be referred." In the declaratory judgment portion of the amended complaint, JDI alleges that "the resolution of these issues will materially affect ... the interest or potential interest of North Bros. to the extent that Auto–By–Tel intends to or may enter or has entered into a contract with North Bros...." The "Relief Requested" section, however, does not even mention North Brothers.

JDI also contends that the district court's denial of its request for a preliminary injunction "that would have restrained North Bros. from servicing Auto–By–Tel customers" demonstrates that JDI had requested relief against North Brothers. This argument must fail, however, because *all* Ford dealerships would have been prevented from entering into an agreement with ABT for the area in question if the district court had granted the preliminary injunction. By JDI's logic, anyone with whom ABT might conduct business in the place of JDI could be considered a potential defendant by virtue of the district court's denial of JDI's motion for a preliminary injunction. This is a novel interpretation not even hinted at by the courts of Michigan, this circuit, or any other court. Thus, even if a Michigan court were to permit JDI's request for a declaratory judgment to proceed forward against ABT, it would not consider North Brothers to be a proper defendant in such an action.

The first reason that JDI would not have prevailed against North Brothers in state court is that the dispute between JDI and ABT had already ripened into a breach-of-contract action shortly after the lawsuit was filed, obviating the need for a declaratory judgment. The purpose of Michigan's declaratory judgment rule has been described as follows:

> Its purpose is to enable parties, in appropriate circumstances of actual controversy, to obtain an adjudication of their rights before actual injury occurs, to settle matters before they ripen into violations of law or *a breach of contractual duty*, to avoid a multiplicity of actions by affording a remedy for declaring in one expedient action the rights and obligations of all litigants, or to avoid the strictures associated with obtaining coercive relief, when coercive relief is neither desired nor necessary to resolve the matter.

3 Martin, Dean, & Webster, Michigan Court Rules Practice R.2.605 (3d ed 1986).

In this case, ABT has already exercised its rights under the termination clause of its subscription agreement with JDI. What JDI seeks, therefore, is redress for its alleged injury, not a legal means to prevent such injury. Although the declaratory judgment rule provides that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in an appropriate case," Mich. Comp. Laws. Ann. § 2.605(c) (West 1999), it is clear in the present case that a declaratory judgment would be redundant with the relief already sought for breach of contract.

The second reason that JDI has no cause of action against North Brothers in state court is that North Brothers is a third party that is not involved in JDI's contract dispute with ABT. In *Skiera v. National Indemnity Co.*, 165 Mich.App. 184, 418 N.W.2d 424, 427 (1987), the Michigan Court of Appeals stated that

> we believe that the breach of contract to be avoided by use of the declaratory judgment is normally one where the contemplated conduct or inaction by the plaintiff affects a contract between the plaintiff and the defendant in the declaratory judgment action, not between the

plaintiff and a third party. In other words, it would be inequitable to require a party to defend itself in a declaratory judgment action where the desired purpose is to prevent a breach of a contract between the plaintiff and a third party.

Although the *Skiera* court stated in a footnote that it was possible that a declaratory judgment action might be used against strangers to a contract in some situations, it did not specify when this would be appropriate. *See id.* at 427 n. 2. JDI cites no case, and we find none, that permits a plaintiff to include a third party as a defendant in this type of declaratory judgment action. The present case is not one in which declaratory relief against a third party is warranted. JDI did not allege that North Brothers would otherwise be free to ignore a decision restraining ABT, nor did it claim that North Brothers tortiously interfered with JDI's contractual rights. As mentioned above, JDI requested no relief of any kind from North Brothers.

For all of the reasons set forth above, we affirm the district court's denial of JDI's motion to remand the case to state court.

**B. The subscription agreement is not a "franchise agreement" within the meaning of the Michigan Franchise Investment Law**

*1. Statement of the issue*

The subscription agreement between JDI and ABT contains a clause permitting either party to terminate the agreement with or without cause upon 30 days' written notice to the other party. ABT gave such notice to JDI on April 22, 1997, to become effective on May 24, 1997. JDI's attempt to invalidate the termination clause of the agreement is based upon a provision of the Michigan Franchise Investment Law, MICH. COMP. LAWS. ANN. § 445.1527(c) ("MFIL"). The statute provides, in relevant part, that "[e]ach of the following provisions is void and unenforceable if contained in any documents relating to a franchise: ... (c) A provision that

permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause." If the contract between JDI and ABT constitutes a franchise agreement covered by the MFIL, then the termination clause is void and unenforceable. If, on the other hand, the agreement is not covered by the MFIL, then summary judgment for ABT was proper. The district court concluded that ABT and JDI did not have a franchisor-franchisee relationship, and thus granted summary judgment for ABT.

*2. Standard of review*

This court reviews a district court's order granting summary judgment *de novo*. *See Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996). For summary judgment to be granted, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Niecko v. Emro Mktg. Co.*, 973 F.2d 1296, 1303–04 (6th Cir.1992) (internal citations and quotation marks omitted). Because no material facts are in dispute in the present case, one party or the other is appropriately entitled to summary judgment. The question remaining is whether the district court correctly concluded that the MFIL does not apply to the agreement between JDI and ABT.

*3. The meaning of "franchise" under the MFIL*

The MFIL defines the term "franchise" as follows:

> "Franchise" means a contract or agreement, either express or implied, whether oral or written, between 2 or more persons to which all of the following apply:
>
> (a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or sys-

tem prescribed in substantial part by a franchisor.

(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate.

(c) The franchisee is required to pay, directly or indirectly, a franchise fee.

MICH. COMP. LAWS. ANN. § 445.1502(3).

The district court found that although JDI paid ABT a franchise fee, JDI neither offered goods or services under an ABT marketing plan nor offered goods or services substantially associated with ABT's service mark. For these reasons, the district court held that the MFIL did not apply to the agreement between the parties.

a. ABT did not grant JDI the right to offer goods or services under a marketing plan prescribed by ABT

■ Our inquiry into whether an agreement satisfies clause (a) of the MFIL's definition of "franchise" involves two separate questions. The first question is whether the agreement grants JDI as the putative franchisee the right to offer, sell, or distribute goods or services. The second question is whether such distribution or sale is done under a marketing plan prescribed in substantial part by ABT. In the present case, the answer to both questions is "no."

First, the subscription agreement does not purport to grant JDI the right to offer its customers any goods or services. JDI is in the business of selling and leasing Ford cars and trucks. It paid ABT for providing the dealership with a means of selling these vehicles to a wider range of potential buyers. This placed JDI in the position of being ABT's customer, not its franchisee. At the point when JDI received a referred customer from ABT's service, the customer has already used the "service" provided by ABT, and was instead seeking the product that JDI provides—a vehicle. That ABT instructed JDI to "sell the service" is not dispositive, because JDI did not in fact "sell" anything associated with ABT to the referred customers.

JDI charged no fee, nor made any additional profit, based upon its use of ABT's prescribed selling techniques to customers. To the extent that any "goods" or "services" were offered in this case, they are the phone numbers of customers who utilized ABT's web site. JDI cites no case, and we find none, where a dealer utilizing a means of selling its own product was held to have been authorized to offer a service under a franchise act. We therefore agree with the district court that the agreement did not authorize JDI to offer any "services" of ABT within the meaning of the MFIL.

Second, the agreement does not prescribe a "marketing plan" within the meaning of the MFIL's definition of a franchise. Interpreting a similar provision of the Connecticut Franchise Act, CONN. GEN. STAT. § 42–133e (1998), the United States District Court for the District of Connecticut set forth the following factors for determining whether a "marketing plan" exists:

... control over hours and days of operation, advertising, financial support, auditing of books, inspection of premises, control over lighting, employee uniforms, prices, trading stamps, hiring, sales quotas and management training.

*Chem–Tek, Inc. v. General Motors Corp.*, 816 F.Supp. 123, 129 (D.Conn.1993).

In support of its argument that JDI offered "services" under an ABT-prescribed marketing plan, JDI notes that ABT requires subscribing dealerships to train one employee as an "ABT representative," dictates the length of time that dealerships must leave an offered price on the table, and closely scripts the interactions between dealerships and customers referred by ABT. On the other hand, ABT exercises no control whatsoever over the

day-to-day business decisions of subscribing dealerships. JDI sets its own hours of operation, hires and trains employees subject to its own policies (even the "ABT representative" can be terminated on grounds unrelated to the ABT subscription agreement so long as JDI designates another employee to deal with ABT referrals), and sets its own sales goals. Significantly, ABT conducted no audits of JDI's books. This is because JDI is a business that functioned independently of ABT. Finally, the record is devoid of evidence that ABT set standards for the percentage of ABT sales that must be completed.

In *Sorisio v. Lenox, Inc.*, 701 F.Supp. 950, 960 (D.Conn.1988), the district court held that a franchise relationship did not exist between a luggage manufacturer and a dealer even though the luggage manufacturer set "image criteria" for its dealers. The district court acknowledged that there is no precise formula for determining how many factors must be present before a "franchise" will be found. *See id.* Instead, the court characterized the inquiry as one of whether the alleged franchisor exercises sufficient control to constitute a "marketing plan" within the meaning of the Act. *See id.* It then stated that "[i]nstructions on product promotion, display and training, both of which were geared toward intrastore product differentiation, do not constitute indicia of control." *Id.*

The *Sorisio* decision has numerous similarities with the present case. In *Sorisio*, the dealer carried the manufacturer's luggage as well as other brands. The manufacturer in *Sorisio* also instructed the dealer on how to promote its product, but did not exercise control over sales operations or over the price that the dealer set for the manufacturer's luggage line. Like in *Sorisio*, JDI's automobile sales that resulted from its relationship with ABT constituted only a small portion of its sales as a whole. Also like in *Sorisio*, ABT takes steps to insure that its web site is associated with a certain level of service. But ABT's guidelines for conducting "Auto–By–Tel Sales," like the image criteria set in *Sorisio*, do not amount to a marketing plan. *See also*

*James v. Whirlpool Corp.*, 806 F.Supp. 835, 842 (E.D.Mo.1992) (holding that a contract with a Michigan choice-of-law clause did not create a franchise agreement under the MFIL between a Michigan manufacturer and a Missouri distributor where the manufacturer was found to have very little control over the distributor's decision-making process). The facts in the present case are even more favorable to ABT than the *Sorisio* facts were to the manufacturer, because the subscription agreement does not purport to authorize JDI to offer any product or service provided by ABT.

b. JDI did not distribute goods or services substantially affiliated with the service mark of ABT

The district court further found that even if the agreement authorized JDI to offer ABT's goods or services under a marketing plan, it was nonetheless not covered by the MFIL because JDI did not distribute goods or services substantially associated with ABT's service mark. Although "substantially associated" is not defined in the MFIL or similar acts, several courts have interpreted it to imply that the franchisee must be financially dependent upon the franchisor. For example, the court in *Chem–Tek* stated that "[t]he requirement that the conduct of the franchisee's business be substantially associated with the franchisor's trademark does not require exclusivity ... [but][t]he franchisee must be sufficiently dependent on the franchisor that termination would be not only harmful, but disastrous." *Chem–Tek*, 816 F.Supp. at 129.

The rationale of *Chem–Tek* is harmonious with the MFIL's purpose of preventing abuse of the perceived unequal bargaining power that exists between franchisors and franchisees. *See Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1056 (6th Cir.1994). Franchisees are rendered particularly vulnerable when they depend upon the franchisor for the bulk of their business. The court in *Sorisio*

found it significant that only a small portion of the alleged franchisee's business came from the alleged franchisor. Although it declined to give a precise percentage or formula, it stated that "[w]here the franchisee is completely dependent on the public's confidence in the franchised product for *most or all his business,* abrupt severance of the franchise tie, without good cause and without sufficient notice, could spell ruination." *Sorisio,* 701 F.Supp. at 961 (internal quotation marks and citation omitted) (emphasis in original). Finding that the dealer in *Sorisio* depended upon the manufacturer for less than 10% of its sales, the district court concluded that no such dependence existed in that case. *See id.*

We similarly conclude that no such dependence existed in the present case. JDI, a well-established business with multi-million dollar annual revenues, garnered only about 4% of its sales through its agreement with ABT. Although it was required by the agreement to display the ABT service mark, the overwhelming bulk of its customers associated JDI with the Ford trademark, not with ABT. The district court therefore correctly held that JDI did not offer goods or services substantially associated with ABT's service mark. Because the subscription agreement is thus not covered by the MFIL, we affirm the district court's grant of summary judgment for ABT.

### III.  CONCLUSION

For all of the reasons stated above, we **AFFIRM** the decision of the district court.