*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0172P (6th Cir.)
File Name: 04a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TENNESSEE PROTECTION &
ADVOCACY, INC.,
  *Plaintiff-Appellant,*

  *v.*

JON A. WELLS, ESQUIRE;
RONALD BRUCE ARRISON;
and KING'S DAUGHTERS &
SONS NURSING HOME, INC.,
  *Defendants-Appellees.*

No. 02-6221

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 01-00078—William J. Haynes, Jr., District Judge.

Argued: March 9, 2004

Decided and Filed: June 9, 2004

Before: BOGGS, Chief Judge; DAUGHTREY, Circuit
Judge; and ALDRICH, District Judge.[*]

_____

[*] The Honorable Ann Aldrich, United States District Judge for the
Northern District of Ohio, sitting by designation.

_____

## COUNSEL

**ARGUED:** Gary Housepian, TENNESSEE PROTECTION
& ADVOCACY, INC., Nashville, Tennessee, for Appellant.
Tyree B. Harris IV, WILLIS & KNIGHT, Nashville,
Tennessee, Brigid M. Carpenter, BAKER, DONELSON,
BEARMAN, CALDWELL & BERKOWITZ, Nashville,
Tennessee, for Appellees. **ON BRIEF:** Gary Housepian,
TENNESSEE PROTECTION & ADVOCACY, INC.,
Nashville, Tennessee, for Appellant. Tyree B. Harris IV,
WILLIS & KNIGHT, Nashville, Tennessee, Brigid M.
Carpenter, BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, Nashville, Tennessee,
Ronald L. Smith, Michael Kirkman, OHIO LEGAL RIGHTS
SERVICE, Columbus, Ohio, for Appellees.

BOGGS, C. J., delivered the opinion of the court, in which
ALDRICH, D. J., joined. DAUGHTREY, J. (pp. 18-20),
delivered a separate dissenting opinion.

_____

## OPINION

_____

BOGGS, Chief Judge. Tennessee Protection & Advocacy,
Inc. (TP&A) is a federally-mandated independent non-profit
agency that investigates allegations of abuse against the
disabled. It appeals the district court's holding that one of its
clients, Martin Earle Bentley, is not covered under the
Developmental Disabilities Assistance and Bill of Rights Act
(DD Act), and that therefore TP&A has no statutory authority
to obtain Bentley's records without the permission of his
court-appointed conservator. We hold that the plain meaning
of the statutory definition of developmental disability covers

individuals with Bentley's kind of traumatic brain injury, and we reverse the decision of the district court.

**I**

Martin Earle Bentley, a long-haul truck driver, suffered a traumatic brain injury from an on-the-job crash in 1976, when he was 20 years old. As a result, he was permanently disabled and must live in a nursing home because he is unable to care for himself. In light of Bentley's condition after the accident, the Probate Court of Macon County, Tennessee appointed attorney Jon Wells to be the conservator of Bentley's person and estate in 1980.

In 2001, Bentley contacted TP&A because he had concerns about both the handling of his financial affairs and restraints on his personal autonomy. In a conference call with TP&A representatives, including a TP&A staff attorney, Bentley explained his grievances. In the staff attorney's opinion, Bentley demonstrated "adequate cognitive ability" to speak for himself, and expressed his wishes in an "unequivocal consistent manner." Bentley summed up his situation as follows: "A man of my age and ability should not be locked up in a nursing home." Bentley authorized TP&A to examine all the necessary records to advocate on his behalf.

TP&A is the Tennessee chapter of a network of independent agencies, known as the Protection & Advocacy System, that Congress funded in the DD Act as part of the Protection and Advocacy for Persons with Developmental Disabilities (PADD) Program. In order to receive funding under the Act, each state must "have in effect a system to protect and advocate the rights of individuals with developmental disabilities." 42 U.S.C. § 15043(a)(1). For the state to qualify for funding, the agency must "not be administered by the State Council on Developmental Disabilities [and must] be independent of any agency that provides treatment, services, or habilitation to individuals

with developmental disabilities." 42 U.S.C. § 15043(a)(F)-(G). In general, the P&A System serves individuals with a range of developmental disabilities by, among other things, investigating allegations of abuse; the agency is authorized to take legal action on behalf of its clients if claims cannot otherwise be resolved. *See* 42 U.S.C. § 15043(a) (giving full recitation of the agency's powers).

Following normal procedures, a case advocate with TP&A faxed a letter to Wells on December 8, 2000 asking to see Bentley's records and offering to help resolve any dispute between the two. She then called Wells on December 11, when he informed her that he would only release Bentley's records in response to a court order. TP&A also tried to secure the records through the King's Daughters and Sons Nursing Home, where Bentley is a resident, but met with the same response. The Nursing Home administrator also forbade his staff to discuss the litigation with Bentley.

Unable to obtain the necessary information to investigate Bentley's allegations, TP&A filed suit in district court in September 2001 against Wells, the Nursing Home, and its administrator, Ronald Arrison. TP&A moved for summary judgment and a preliminary injunction; Wells cross-claimed for summary judgment. The Nursing Home did not respond to TP&A's motion for summary judgment.

In September 2002, the district court granted Wells summary judgment on the grounds that the DD Act did not cover traumatic brain injury, Bentley's type of disability, and therefore TP&A had no right to review Bentley's records. This appeal then followed.

**II**

This court reviews a grant of summary judgment *de novo*. *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir. 1995) (per curiam). Summary judgment is appropriate when the

evidence submitted shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The facts in this case are not disputed, and therefore one of the parties is entitled to summary judgment as a matter of law. *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 176 F.3d 904, 909 (6th Cir. 1999).

To demonstrate that it has legal authority to gain access to Bentley's records, TP&A must show that he is covered by the DD Act. 42 U.S.C. § 15001 *et seq.*[1] This case turns on whether the term "developmental disability," as used in the Act, can apply to those who suffer from traumatic brain injury, rather than being limited to those afflicted by some type of congenital or disease-related defect. The district court concluded that the "clear language of the statute reflects that it is intended to cover individuals who have some physical or mental disability or condition as a result of *natural causes*." *Tenn. Protection & Advocacy v. Wells*, No. 2:01-0078, at 4 (M.D. Tenn. Sept. 30, 2002) (Mem. Op.) (emphasis added). The court invoked the rule of statutory construction that all words of the statute are intended to have meaning and no interpretation should be adopted that "would render statutory phrases meaningless, redundant, or superfluous." *Ibid.* (citing *United States v. Holmquist*, 36 F.3d 154, 160 (1st Cir. 1994)). To expand the definition further to include disabilities resulting from injury, would, according to the district court's opinion, ignore the meaning of the word "developmental,"

and therefore Bentley was not qualified for protection under the Act. *Id*. at 5.

However, the statute in *Holmquist* did not define the term in dispute. Instead, the court had to solve an "interpretive riddle" presented by a customs statute. *Holmquist*, 36 F.3d at 158. In contrast, the DD Act contains an explicit and multi-faceted definition of the term "developmental disability," and that definition must govern the resolution of this case; we are not at liberty to put our gloss on the definition that Congress provided by looking to the generally accepted meaning of the defined term. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698 n.10 (1995) (pointing out that "Congress explicitly defined the operative term 'take' in the [Endangered Species Act] . . . thereby obviating the need for us to probe its meaning"); *United States v. Smith*, 155 F.3d 1051, 1057 (9th Cir. 1998) (observing that when "the meaning of a word is clearly explained in a statute, courts are not at liberty to look beyond the statutory definition"). Therefore, although it may not be intuitive to think of a brain injury that results from a vehicle accident when the victim is 20 years old as a "developmental disability," we must do so because Bentley's condition fits the definition that is provided in the statute.

TP&A is not reading the term "developmental" out of the statute, but is asking us to follow the definition that Congress crafted. According to the statute:

The term "developmental disability" means a severe, chronic disability of an individual that--

(i) is attributable to a mental or physical impairment or combination of mental and physical impairments;

(ii) is manifested before the individual attains age 22;

(iii) is likely to continue indefinitely;

---

[1] There appears to be no dispute that if Bentley is covered, then TP&A has authority to access his records under the DD Act. 42 U.S.C. § 15043(a)(2)(I)(iii) (stating that the P&A system shall have access to all records of any individual with a developmental disability in a situation in which 1) the individual has a legal conservator; 2) a complaint has been received; 3) there is probable cause to believe the person has been subject to abuse or neglect; and 4) the representative has been contacted and offered assistance but has failed to act on behalf of the individual).

(iv) results in substantial functional limitations in 3 or more of the following areas of major life activity:

    (I) Self-care.
    (II) Receptive and expressive language.
    (III) Learning.
    (IV) Mobility.
    (V) Self-direction.
    (VI) Capacity for independent living.
    (VII) Economic self-sufficiency; and

(v) reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.

42 U.S.C. § 15002 (8)(A).

For the reasons below, we reject Wells's[2] arguments that Bentley does not have a developmental disability because 1) he did not gradually acquire it; 2) his condition does not satisfy the medical definition of chronic; and 3) it did not manifest, or reveal, itself over a period of time. Under a straightforward reading of the statute, Bentley is covered.

*Nature of the Disability*

The definition of developmental disability in the DD Act is framed in terms of a person's functional limitations and does not refer to any specific diseases or causes. Earlier versions of the DD Act defined the term by a list of specific conditions, such as mental retardation or cerebral palsy.

---

[2]This opinion refers to the appellees collectively as "Wells." Bruce Arrison, the nursing home administrator, indicated that he was following Wells's instructions and does not object *per se* to releasing Bentley's information. Therefore, Wells is *de facto* the sole appellee in this case.

Congress consistently expanded the definition to include more diagnoses; in 1978, it amended the statute again, "deleting all references to specific handicapping conditions and establishing a definition based on functional limitations." *Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978*, Pub. L. No. 95-602, Sec. 503, 42 U.S.C. § 6001, 92 Stat. 2955 (1978); S. Rep. No. 103-120, at 5 (1994), *reprinted in* 1994 U.S.C.C.A.N. 164, 168. Functional limitations, *i.e.*, the result of the condition, govern the determination of whether a person falls under the Act's protection, not medical history, *i.e.*, the cause. No one doubts that Bentley meets the functional limitation requirements of the DD Act.[3] The statute treats the words "functional" and "developmental" as essentially synonymous and we conclude that his disability meets the statutory definition.

*Chronic Condition*

Bentley's brain injury resulted in a severe, "chronic" disability that is a result of physical impairment (subsection i). Chronic means "persisting over a long period of time." *Dorland's Illustrated Medical Dictionary* 363 (30th ed. 2003). The DD Act does not define the term, but the Family Leave and Medical Act defines a "chronic serious health condition" as one which "[c]ontinues over an extended period of time (including recurring episodes of a single underlying condition); and [is characterized by a] . . . period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. . . . Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease." *Perry v. Jaguar of Troy*, 353 F.3d 510, 515 (6th Cir. 2003) (quoting 29 C.F.R. § 825.114(a)(2)). A "severe

---

[3]Bentley's brain injury is permanent (42 U.S.C. § 15002(8)(A)(iii) and has resulted in more than three "substantial functional limitations" (subsection iv). Finally, Bentley requires "lifelong" specialized and general care (subsection v).

No. 02-6221    *Tenn. Protection & Advocacy*    9
*v. Wells, Esquire, et al.*

10    *Tenn. Protection & Advocacy*    No. 02-6221
*v. Wells, Esquire, et al.*

stroke" is also a condition that comes on suddenly, with devastating consequences, meaning that a chronic condition is not limited to those characterized by a slow and steady deterioration. The focus is on the prognosis for recovery, not on the cause or onset of the medical disorder.[4]

Furthermore, a chronic condition can result from an outside agent: the Black Lung Benefits Act defines "pneumoconiosis," the condition needed for an award of benefits, as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, *arising out of coal mine employment*." 30 U.S.C. § 902(b) (emphasis added). On one occasion, this circuit even described a series of suicide attempts as a "chronic" health problem. *Williams v. Mehra,* 135 F.3d 1105, 1109 (6th Cir. 1998) *rev'd en banc*, 186 F.3d 685 (6th Cir. 1999). Therefore, neither Congress nor this circuit has limited its understanding of a chronic medical problem to a long-term condition resulting from natural causes. It is undisputed that Bentley's brain injury has resulted in permanent incapacity, which would qualify it under the general understanding of the term "chronic," as used in § 15002(8)(A).

*Manifestation of the Disability*

Bentley's disability "manifested" itself, that is became obvious, before age 22 (subsection ii). The dictionary defines "manifest" as "[c]learly apparent to the sight or understanding; obvious" and "manifested" as "[t]o show or demonstrate plainly." *American Heritage Dictionary* 1064 (4th ed. 2000). Black's Law Dictionary uses the term in

various legal contexts, consistently with the meaning of obvious: *e.g.*, "manifest injustice," defined as "[a]n error in the trial court that is direct, obvious, and observable," *Black's Law Dictionary* 974 (7th ed. 1999); "manifest necessity" is defined as a "sudden and overwhelming emergency" that precludes completion of a trial. *Id.* at 975.

Wells argues that "manifest" means "revealed" and therefore refers exclusively to the exposure of something that already existed but was hidden. Bentley's brain injury was not a condition that lay dormant, but rather was the instant result of his collision in the truck, leading Wells to conclude that Bentley's injury did not "manifest" itself, as the statute requires. Although "reveal" is one plausible meaning, it is not the only one. This circuit has consistently used the term "manifest" to mean "be apparent:" *Am. Ship Bldg. Co. v. Dir., Office of Workers' Compensation Programs, United States Dep't of Labor,* 865 F.2d 727, 732 (6th Cir. 1989) (stating a preexisting condition must have *manifested itself* either to the employer through observation or to a doctor from a medical examination for the company to qualify for special fund disability payments due to subsequent injury); *Abbott v. Sullivan,* 905 F.2d 918, 926 (6th Cir. 1990) (stating that an impairment must be taken into consideration under the Medical-Vocational guidelines for determining disability, even if it does not *manifest itself* as a limitation on strength) (emphases added). Therefore, nothing in either the dictionary definition of "manifest," the legal usage of the term, or the way that this circuit has used the word, suggests that it must refer to a condition that always existed and *became* obvious. We see no reason why "manifest" cannot just as easily be used to describe something newly created that is now visible. It simply is another way of saying that a condition is readily observable.

---

[4] We construe the term "chronic" in the DD Act *in pari materia* with the FMLA, as both acts seek to protect those who have pressing medical needs and their families. *Cf. Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1168 (11th Cir. 2003) (drawing upon Title VII, the Americans with Disabilities Act, and the Fair Labor Standards Act to construe the term "person" in the FMLA in conformity with other civil rights statutes).

*End point of the Developmental Period*

Nor is age 22 a random cut-off point; it is an eligibility requirement that resulted from policy, rather than medical,[5] judgments. In 1978, Congress revised the DD Act and raised the eligibility age for assistance from 18 to 22 years. H.R. Rep. No. 95-1188, at 8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7355, 7362. The initial objective was to include everyone with a severe disability within the purview of the statute. Advocates for disabled children objected, however, fearing that universal coverage would spread the available resources too thinly. *Rehabilitation Amendments of 1978: Hearings Before the Subcomm. on Human Resources of the United States Senate*, 95th Cong. 83, 113 (1978) (testimony advocating that the Senate adopt the definition of development disability drafted by a task force that recommended an eligibility cut off at age 22). Therefore, the eligibility age of 22 represents the limitation that Congress determined would provide the optimal balance between a general commitment to helping the disabled and funding realities. Restricting eligibility further through the cramped reading of the statute that Wells proposes would ignore both the plain meaning of the legislation and its intent.

In adjudicating disability claims, we must respect the eligibility requirements established by Congress. For instance, the Supplemental Security Income (SSI) program considers someone disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[5] *See, e.g.*, American Academy of Child and Adolescent Psychiatry, *Practice Parameters for the Assessment and Treatment of Children, Adolescents, and Adults with Mental Retardation and Comorbid Mental Disorders*, 1999 (explaining that "developmental disability is actually not a medical term but a 'legislative/legal concept'").

expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). However, to receive SSI disability payments for mental retardation evidenced simply by a low IQ score, a claimant must demonstrate "a significantly subaverage general intellectual functioning with deficits in adaptive functioning *initially manifested during the developmental period*; *i.e., the evidence demonstrates or supports onset of the impairment before age 22.*" 20 CFR Pt. 404, Subpt. P, App. 1 § 12.05 (emphasis added). This circuit has denied benefits to claimants who could not demonstrate mental deficiency before age 22. *Foster v. Halter,* 279 F.3d 348, 354-55 (6th Cir. 2001) (denying claim because Foster's first IQ test was done when she was 42 years old and therefore she could not demonstrate that her subaverage intellectual functioning manifested itself before age 22); *Brown v. Sec'y of Health and Human Servs.,* 948 F.2d 268, 271 (6th Cir. 1991) (remanding to determine if the claimant's mental impairment was "'manifested during [claimant's] developmental period' or rather [was] a partial consequence of claimant's history of heavy alcohol use after the age of twenty-two"). We accept the eligibility provision in the DD Act at face value in order to be consistent with our interpretation of the same age requirement in the context of other public welfare legislation.

Congress has determined that it is appropriate to consider a person's "developmental period" to extend to age 22 to assess eligibility for government assistance. However natural it would be to consider a 20-year old truck driver as a fully grown adult, it is well-settled law that when a statutory definition contradicts the everyday meaning of a word, the statutory language generally controls: judges should "construe legislation as it is written, not as it might be read by a layman." *Meese v. Keene,* 481 U.S. 465, 485 (1987). Only when following the literal language of the statute would lead to "an interpretation which is inconsistent with the legislative intent or to an absurd result" can a court modify the meaning of the statutory language. *Appleton v. First Nat'l Bank of*

*Ohio,* 62 F.3d 791, 801 (6th Cir. 1995). Congress may not have had truck drivers with brain injuries in mind when it drafted the legislation, but Bentley easily falls into the category of people whom Congress intended to protect. *Cleland v. Bronson Health Care Group*, 917 F.2d 266, 270 (6th Cir. 1990) (clarifying that if the plain language of a statute leads to a broader result than Congress might have anticipated, it is still not automatically tantamount to an absurd result). We have no basis on which to second guess the language that Congress used because applying the statute to Bentley neither contradicts the legislative intent nor produces an absurd result.

The district court erred in inferring a requirement that the disability result from natural causes because reference to injury is lacking in the statute. It is axiomatic that the statutory definition of the term excludes unstated meanings of that term. *Colautti v. Franklin,* 439 U.S. 379, 392 n.10 (1979). The Supreme Court reiterated this rule last term, rejecting the plaintiff's attempt to read a requirement for heightened burden of proof for a "mixed motive" jury instruction into the 1991 Civil Rights Act. *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). In a unanimous opinion, the Court dismissed the plaintiff's interpretation because "[o]n its face, the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence." *Id.* at 99.

In this case, the statute does not distinguish between disabilities caused by injury and those that result from organic defects, but emphasizes improving the condition of all citizens with disabilities by delivering various kinds of assistance:

(1) disability is a natural part of human experience that does not diminish the right of individuals with developmental disabilities to live independently, to exert control and choice over their own lives, and to fully

participate in and contribute to their communities through full integration . . .; [but that] (5) individuals with developmental disabilities are at greater risk than the general population of abuse, neglect, financial and sexual exploitation, and the violation of their legal and human rights.

42 U.S.C. § 15001(a)(1), (5). The statute contrasts the disabled with the general population, but does not distinguish among the different categories of disability, because its purpose is to erase all distinctions made because of handicap. Narrowing the definition of "developmental disability" to prevent TP&A from assisting Bentley in achieving greater personal autonomy contravenes the basic intent of the statute. The declaration that it is a "goal of the nation" that people with disabilities "live free of abuse, neglect, financial and sexual exploitation, and violations of their legal and human rights," 42 U.S.C. § 15001(a)(16)(F), confirms the conclusion that the cause of the disability is immaterial for the purposes of determining eligibility under the DD Act.

### III

The district court bolstered its reading of the statute to exclude Bentley from its protection by pointing to the enactment in 2000 of the "State Grants for Protection and Advocacy Services," which authorizes the Secretary of Health and Human Services to make grants to agencies such as TP&A to provide services to individuals with traumatic brain injuries. 42 U.S.C. § 300d-53. The statute's general provision states:

The Secretary, acting through the Administrator of the Health Resources and Services Administration (referred to in this section as the "Administrator"), shall make grants to protection and advocacy systems for the purpose of enabling such systems to provide services to individuals with traumatic brain injury.

42 U.S.C. § 300d-53. The rest of the section describes funding mechanisms. Therefore, the statute is most easily read as a funding earmark to support those with traumatic brain injury. Its language does not shed any light on whether TP&A should have access to Bentley's records under the current statutory regime because it does not address authority to serve those with brain injuries under the DD Act. The language is too sketchy to support the district court's conclusion that it is "highly probative of Congress' intention as [to] the scope of Section 15002(8) [the statutory definition of developmental disability]." Mem. Op. at 4.

The Protection and Advocacy System is the network of congressionally mandated advocacy agencies, of which TP&A is a member. The 2001 annual report described the § 300d-53 legislation as a program "for [a] new population in special need of our services — persons with traumatic brain injury."[6] Mem. Op. at 5. A court should consider any agency publication because it reflects expertise in the subject matter. *United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001). Nevertheless, this court is not bound by the annual report's assertion that those with traumatic brain injuries constitute a "new population" of clients. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (holding that interpretations "in policy statements, agency manuals, and enforcement

---

[6]The parties dispute the legal significance, if any, of this document: TP&A argues that it is the work of a private organization that has the same weight as "commentary by a columnist in a trade journal." Appellant Br. at 34. Wells argues in his brief that it is a "federally-mandated" report and therefore authoritative. Appellee Br. at 8. The report itself was prepared by the Advocacy Training and Technical Assistance Center, which receives funding from three government agencies. Because the government paid for the publication, and it does not bear a disclaimer divorcing the sponsoring agencies from the opinions expressed in the report, we consider the extent to which we should be guided by the report's characterization of those with traumatic brain injuries as a "new" population under the DD Act.

guidelines, all of which lack the force of law, do not warrant *Chevron*-style deference"). Furthermore, we are forbidden to defer to agency guidelines that contradict the plain meaning of the statute. *Sutton v. United Air Lines*, 527 U.S. 471, 482 (1999) (holding that the EEOC guidelines reflected an impermissible interpretation of the Americans with Disabilities Act and therefore did not warrant judicial deference).

The statement in the annual report may reflect the reality that agencies such as TP&A have generally not, as a matter of fact, included people with traumatic brain injuries in their programs. It cannot, however, provide a basis to preclude such individuals from receiving services under the DD Act because, on its face, the statute's definition of "development disability" encompasses individuals, such as Bentley, who have suffered traumatic brain injury.

The case law is not helpful in resolving this question of statutory construction. TP&A is correct that federal courts have generally interpreted 42 U.S.C. § 15043 to allow the P&A system access to client records. *Wisconsin Coalition for Advocacy v. Czaplewski*, 131 F. Supp. 2d 1039 (E.D. Wis. 2001) (holding right of access to patient records under the DD Act preempts more restrictive state regulations); *Iowa Protection & Advocacy Services v. Rasmussen*, 206 F.R.D. 630 (S.D. Iowa 2001) (same). Wells has not provided any case law that prevents us from following the general trend of allowing organizations in the P&A system liberal access to patient records.

Wells properly challenges the cases that TP&A cites in its brief for the proposition that traumatic brain injury is covered under the DD Act because the cited precedent addresses the legal rights of those with traumatic brain injuries under different statutes, *e.g.*, the Federal Tort Claims Act. *See Colleen v. United States*, 843 F.2d 329 (9th Cir. 1987). Furthermore, the court in each cited case assumed that the

disability is covered under the relevant statute.  *See, e.g., Blackmon ex rel. Blackmon v. Springfield R-XII School District*, 198 F.3d 648 (8th Cir. 1999) (noting without elaboration that student with a bilateral brain injury was covered under the Individuals with Disabilities Education Act).  However, Wells did not cite any case in which a court held that traumatic brain injury is not covered under the DD Act.  Since Bentley can fulfill the five requirements in the statute and construing the statute to include his kind of injury furthers the legislative intent of the Act, the district court erred in finding that it did not apply to him.

## IV

We therefore **REVERSE** the district court's grant of summary judgment and **REMAND** so that the district court may consider the release of Mr. Bentley's records to TP&A under the standards of the DD Act.

_____

## DISSENT

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting.  In construing statutes, we are frequently admonished to avoid interpretations that will produce absurd results.  In stretching the meaning, intuitive or as statutorily defined, of the term "developmental disability" to cover the effect of a traumatic brain injury suffered spontaneously by a fully-functioning 20-year-old, however, the majority in this case has failed to heed the admonition.  To demonstrate the absurdity of this interpretation of the statute at issue here, one need only ask: Why would Congress provide protection under the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15043, to an adult who suffers such an injury one day short of his or her twenty-second birthday, but not to the same person injured in exactly the same manner 24 hours later?  The answer is, of course, as the district judge held, that the Act was never meant to apply to individuals in Martin Bentley's situation – the holder of a GED, who served two years in the United States Army and then became a long-distance truck driver, and who, according to the majority, retains the "'adequate cognitive ability' to speak for himself . . . and express[ ] his wishes in an 'unequivocal consistent manner'."

It is not surprising that Congress initially attempted to describe the term "developmental disability" in terms of a diagnosis but then abandoned the effort.  The term is a contemporary euphemism for "mental retardation," which itself came into use in an effort to erase the stigma attached to much cruder descriptive terms used in the early part of the last century and before, terms such as "moron" (used to describe those with intelligence quotients ranging from 50-69), "imbecile" (having an IQ of 25-50), "idiot" (having an IQ under 25), and the like.

But there are many causes of mental retardation, and the disability can (but does not necessarily) accompany other conditions, such as cerebral palsy and autism – hence the effort to describe developmental disability in terms of function, rather than diagnosis. As the district court recognized, however, the key concept here is not "disability," from which Mr. Bentley undoubtedly suffers. The key, rather, is the descriptive term "developmental," referring obviously to an impairment that "manifests" itself over time and impedes an individual's progress from childhood to post-adolescence and into adulthood, equipped with what are recognized as adequate skills to live independently and productively. Mr. Bentley was living independently, and presumably productively, at the time he became the victim of an unexpected and debilitating accident, one which unfortunately befalls other adults all too frequently but which does not implicate a potential for the denial of civil rights such as the statute in question here was designed to protect against.

Perhaps the problem here is merely poor legislative drafting, an impediment we sometimes face in trying rationally to construe statutes conceived by special interest groups, drafted by committees working under pressure to reach political consensus, and thereafter amended and made increasingly complex. If so, the majority has compounded the problem by reading a badly drafted statute too literally and has thereby reached what I believe is a result that Congress did not intend and would never have envisioned, had it been prescient enough to foresee the application of this civil rights statute to a situation such as the one before us. This seems obvious from the fact that this case presents itself as one of first impression, suggesting that the legislation has never been understood to apply to victims of sudden traumatic injury, regardless of age.

Despite my sympathy for Mr. Bentley's disabled condition and my conviction that the plaintiff here is acting with the

best of intentions, I would affirm the district court for the reasons set out in its memorandum opinion and deny relief.